915 P.2d 672

STATE of Hawai'i, Plaintiff–Appellee,

v.

William MERINO, Defendant–Appellant.

No. 15995.

Supreme Court of Hawai'i.

April 11, 1996.

Dana S. Ishibashi, on the briefs, Honolulu, for defendant-appellant William Merino.

Charlotte J. Duarte, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The defendant-appellant William Merino appeals the March 12, 1992 judgment of the first circuit court convicting him, following the entry of a plea of no contest,[1] of criminal conspiracy in violation of Hawai'i Revised Statutes (HRS) § 705–520 (1993). In substance, Merino raises two points of error on appeal, namely, that the circuit court: (1) erred in allowing him to plead no contest in the first place because (a) the complaint charging him with criminal conspiracy was fatally defective, giving rise to plain error, because it "fail[ed] to sufficiently allege the elements of conspiracy," (b) the factual basis proffered by the prosecution prior to the entry of his no contest plea was insufficient to support the complaint, and (c) he had not validly waived his right to counsel, likewise giving rise to plain error; and (2) committed an abuse of discretion in denying his motion to withdraw his no contest plea. We disagree and affirm Merino's conviction.

## I.  BACKGROUND

### A.  The No Contest Plea

On August 25, 1988, Merino appeared *pro se* before Judge Donald K. Tsukiyama of the first circuit court in Cr. No. 86–0990, in

---

1. A "no contest" plea is the same as a plea of "nolo contendere," which is a "Latin phrase meaning 'I will not contest it.'" *Black's Law Dictionary* 1048 (6th ed.1990).

which Merino was charged with extortion in the first degree, a class B felony, in violation of HRS § 707–765 (1985).[2] Also present was deputy prosecuting attorney Peter Carlisle. After obtaining confirmation from Merino that he was the defendant in the pending matter, Judge Tsukiyama noted Merino's *pro se* status and elicited Merino's acknowledgment that, in an earlier appearance in the matter, another circuit court judge, Judge Daniel Heely, had explained to Merino his right to the assistance of counsel—including court-appointed counsel—in his defense. Judge Tsukiyama further established that Merino had decided not to apply for court-appointed counsel, but rather to represent himself.

In an obvious abundance of caution, however, Judge Tsukiyama engaged in the following colloquy with Merino after determining that Merino was fifty-five years of age, had an eleventh grade education, and could read, write, and understand the English language:

THE COURT: ... [I]n relation to this matter, ... I understand that you have made several appearances in court; is that correct?

MR. MERINO: Yes, sir.

THE COURT: And in each of these appearances you have represented yourself, is that correct?

MR. MERINO: Yes, sir.

THE COURT: Okay. Now, I went over this briefly with you previously, but I do want to review once again what the Court considers to be very important considerations in relation to your decision as to whether you want to represent yourself or have the assistance of counsel.

Now, do you understand that by not having a lawyer represent you that could be very detrimental to your cause?

MR. MERINO: Yes, sir.

THE COURT: And you understand that unless you are trained in the law you might have difficulty representing yourself because this whole proceeding, this trial, will be governed by the law, including what we refer to as the Rules of Evidence. You understand that?

MR. MERINO: Yes, sir.

THE COURT: And do you understand that your lack of knowledge of the law and the Rules of Evidence could work against you and, that is, you may lose some valuable substantive rights because you don't know what the law is?

MR. MERINO: Yes, sir.

THE COURT: All right. And you understand that during the course of the trial the Court cannot assist you in this regard? That is, the Court cannot act as your legal advisor and tell you what the law is or what the Rules of Evidence are. Do you understand that?

MR. MERINO: Yes, sir. Yes, I do, sir.

THE COURT: So if there is indeed evidence presented which is objectionable and may be highly prejudicial, but you

---

**2.** In 1988, HRS § 707–765, which was enacted in 1979, 1979 Haw.Sess.L.Act 106, pt of § 1 at 252–53, provided in relevant part:

**Extortion in the first degree.** (1) A person commits the offense of extortion in the first degree if he [or she] commits extortion:
(a) Of property or services the value of which exceeds $200 in total during any twelve-month period[.]
....
(2) Extortion in the first degree is a class B felony.

HRS § 707–765 (1985). At the same time, HRS § 707–764, also enacted in 1979, 1979 Haw.Sess.L.Act 106, pt of § 1 at 252, provided in relevant part:

**Extortion.** A person commits extortion if he [or she] does any of the following:
(1) Obtains, or exerts control over, the property or services of another with intent to deprive him [or her] of the property or services by threatening by word or conduct to:
(a) Cause bodily injury in the future to the person threatened or to any other person; or
(b) Cause damage to property; or
(c) Subject the person threatened or any other person to physical confinement or restraint; or
....
(k) Do any other act which would not in itself substantially benefit the defendant but which is calculated to harm substantially some person with respect to his [or her] health, safety, business, calling, career, financial condition, reputation, or personal relationships[.]

HRS § 707–764 (1985) has never been amended. HRS § 707–765 has undergone only stylistic change, rendering it gender neutral.

don't know what it is because you don't understand the law, you don't object to it, so that evidence is considered by the Court or by a jury, you will, as a result, or could, as a result, suffer because of your lack of knowledge regarding the Rules of Evidence [or] the law. You understand that?

MR. MERINO: Yes, sir.

THE COURT: Okay. And later on you will not be permitted to come back and say, well, I want a new trial with a lawyer at this time because I did not understand the law or the Rules of Evidence. Do you understand that?

MR. MERINO: Yes, sir.

THE COURT: Okay. All right. Knowing that self-representation in this case by you could seriously work to your disadvantage, do you still want to proceed without counsel?

MR. MERINO: Yes, I do, Your Honor.

THE COURT: Do you understand that the Court could sentence you to a term of imprisonment of 10 years in this case if you are convicted?

MR. MERINO: I understand that.

THE COURT: Knowing that, do you still wish to proceed without legal counsel?

MR. MERINO: Yes, sir.

THE COURT: All right. The Court is going to find and conclude, based upon its colloquy with Mr. Merino, that he has voluntarily waived his right to be represented by legal counsel in this proceeding with an intelligent waiver of the benefits associated with representation by counsel, and the dangers and disadvantages of self-representation, and with a full and complete

understanding of the consequences of his waiver.

Accordingly, the Court further finds and concludes that the defendant is competent to proceed pro se.

Subsequent to the colloquy set forth above, Judge Tsukiyama set the matter for a jury-waived trial to commence on August 29, 1988.[3] Judge Tsukiyama noted for the record that he understood that plea negotiations were ongoing between Merino and the prosecution and concluded the hearing with the following prophylactic exchange:

THE COURT: ... Do you have any questions, Mr. Merino?

MR. MERINO: No, Your Honor, I don't.

THE COURT: Do you understand what has happened so far?

MR. MERINO: Yes, sir, I have.

THE COURT: Okay. Now, please keep in mind that at any time you're still entitled to seek and obtain the assistance of counsel. The fact that the Court has found that you're capable of representing yourself and that you have waived your right to be represented by legal counsel does not prevent you ... in any way from seeking the advice of legal counsel. You understand that?

MR. MERINO: Yes, I do, Your Honor.

On August 29, 1988, Merino appeared as scheduled before Judge Tsukiyama in Cr. No. 86–0990. At that time, Carlisle, on behalf of the prosecution, advised the court that the matter presently pending before it was to be resolved by a negotiated plea to the charge of criminal conspiracy, a class C felony in violation of HRS § 705–520 (1985),[4] in a

---

3. In the course of the August 25, 1988 proceedings, and following an exhaustive colloquy with the court, Merino knowingly and voluntarily waived his right to a jury trial. Merino does not challenge the validity of his waiver. In any event, it is apparent from the record that Merino's waiver of the right to trial by jury was knowingly and voluntarily entered.

4. HRS § 705–520 (1993), which is unchanged from its 1988 form, provides:

Criminal conspiracy. A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:

(1) He [or she] agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and

(2) He [or she] or another person with whom he [or she] conspired commits an overt act in pursuance of the conspiracy. HRS § 705–526 (1993), which is also unchanged from its 1988 form, provides:

Grading of criminal conspiracy. (1) A conspiracy to commit a class A felony is a class B felony.

(2) Except as provided in subsection (1), conspiracy to commit a crime is an offense of

new matter—Cr. No. 88–1485—in connection with which the prosecution had prepared a complaint [hereinafter, the new complaint] to be filed in open court. Before allowing the new complaint to be filed, Judge Tsukiyama again advised Merino that he was entitled to be represented by counsel in relation to Cr. No. 88–1485 and elicited from Merino his assurances that he did not want to be represented by counsel and that he was willing to proceed without any legal consultation.

Judge Tsukiyama then permitted the new complaint to be filed in open court and directed Carlisle to read it into the record. The new complaint, as read, charged that:

On or about the 1st day of February, 1978, to and including the 31st day of December, 1985, the exact dates being unknown to the City and County of Honolulu, State of [Hawai'i,] WILLIAM MERINO, and the following people herein named but not charged, NANCY MERINO, also known as Sister Nancy, Lufa, Cindy, and Connie, MARY ANN MERINO, also known as Sister Nancy, Lufa, Sister Lufa, Tina Merino and Lavonne, and ANNE MARY MERINO, also known as Sister Nancy, Carleen, Lucy Merino, and Christine Gaegos, TINA MERINO, also known as Sister Nancy, Sister Tina, Helen Merino, and Mama Tina, and DAVID MERINO, with the intent to promote or facilitate the commission of a crime, to wit, Theft in the First Degree, did agree with each other and others known and unknown, that

they or one or more of them would engage in and solicit the conduct or would cause or solicit the result specified by the definition of Theft in the First Degree as defined by [HRS §§] 708–831(1)(b)[5] and 708–830(2).[6]

1. It was part of said conspiracy that the Defendants and others would obtain or exert control over the property of various individuals by deception.

2. It was further a part of said conspiracy that the Defendants and others would conceal the existence of the conspiracy, would take steps designed to prevent disclosure of their activities, and would use deception to prevent or inhibit their victims from reporting their crimes to the proper authorities.

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed within the City and County of Honolulu, State of [Hawai'i]:

## OVERT ACTS

1. On or about the 1st day of October, 1981, to and including the 28th day of February, 1983, the exact dates being unknown, Defendants MARY ANN MERINO, TINA MERINO, NANCY MERINO, ANNE MERINO, DAVID MERINO, and WILLIAM MERINO, did obtain or exert control over the property of Peter Pea, Jr., to wit, money and merchandise and ser-

---

the same class and grade as the most serious offense which is an object of the conspiracy.

**5.** In 1978, HRS § 708–831 provided in relevant part:

  **Theft in the first degree.** (1) A person commits the offense of theft in the first degree if he [or she] commits theft:

  ....

  (b) Of property or services the value of which exceeds $200[.]

  ....

  (2) Theft in the first degree is a class C felony except in the event of extortion, in which case theft in the first degree is a class B felony.

HRS § 708–831 (1976). The organization of HRS §§ 708–830 through 708–839, the provisions of the Hawai'i Penal Code pertaining to "theft and related offenses," has undergone substantial subsequent revision. Of particular relevance, and in conjunction with the enactment of

the extortion statutes, *see supra* note 2, HRS § 708–831(2) was amended in 1979 to provide simply that "[t]heft in the first degree is a class C felony." 1979 Haw.Sess.L.Act 106, § 6 at 255. At the same time, HRS § 708–800(8) (1976), which defined "extortion" in essentially the same manner as HRS § 707–764, *see supra* note 2, was deleted. 1979 Haw.Sess.L.Act 106, § 4 at 254.

**6.** In 1978, HRS § 708–830 provided in relevant part:

  **Theft.** A person commits theft if he [or she] does any of the following:

  ....

  (2) Property obtained or control exerted through deception. He [or she] obtains, or exerts control over, the property of another by deception with intent to deprive him [or her] of the property.

HRS § 708–830 (1976). These provisions have undergone stylistic amendments, but remain substantively the same. *See* HRS § 708–830 (1993).

vices, the value of which exceeds Two Hundred Dollars ($200.00), by deception, with intent to deprive the said Peter Pea, Jr., of the property.

2. WILLIAM MERINO did attempt to establish contacts and relationships with government agencies to permit other members of his family to continue their criminal enterprises.

Therefore, Defendant WILLIAM MERINO committed the offense of Criminal Conspiracy, a class C felony, in violation of Section 705–520 of the [Hawai'i] Revised Statutes.

In response to Judge Tsukiyama's queries, Merino represented that he (1) had received a copy of the new complaint, (2) had had an opportunity to read it, (3) understood that he was being charged with criminal conspiracy, a class C felony, (4) did not need additional time to consider the new complaint, (5) did not want to consult with a attorney regarding it, (6) was prepared to enter a plea to the new charge, and (7) "would plead no contest."

Before accepting Merino's plea, Judge Tsukiyama reviewed with Merino his right to be charged by indictment and his waiver of that right. Judge Tsukiyama admonished Merino that if he had some doubt as to what the court was asking, or if he did not understand a question, he should request repetition or clarification. Merino assured Judge Tsukiyama that he "underst[ood] clearly." Merino then represented that (1) he had taken no pills, drugs, alcohol, or medication during the preceding forty-eight hours, (2) his mind was clear, and (3) he did not wish to consult with an attorney regarding the waiver of his right to be charged by a grand jury. Judge Tsukiyama explained the grand jury process, including Merino's rights associated with it. Merino repeatedly represented that he understood what was being explained to him, in particular, the rights that he would be giving up by waiving indictment, and that he was waiving his right of indictment of his own free will and was not being pressured, forced, or threatened in any way to do so. Merino thereafter signed and dated a waiver of indictment form, which was filed with the court.

The following colloquy ensued:

[THE COURT:] All right, Mr. Merino, the Court will now receive your written no contest statement. Please submit it to the clerk.

The record will note that the Court has previously ruled[,] based upon its colloquy with Mr. Merino, that Mr. Merino is competent to represent himself in relation to related matters. And at this time the Court is going to find and conclude that Mr. Merino is competent to represent himself in relation to Criminal Number 88–1485.

All right, Mr. Merino, do you have any questions about the [new] Complaint . . . ?

[MR. MERINO:] No, sir.

Q. You understand what is written in that [new] Complaint?

A. Yes, I do.

Q. Based upon your reading of the [new] Complaint and your understanding thereof, do you understand what the [prosecution] must prove against you before you can be found guilty of this charge?

A. Yes, I do.

Q. Would you like to consult with legal counsel to discuss any possible defenses you may have to this charge?

A. No, sir.

Q. Mr. Merino, no matter what may have occurred in relation to this charge, you have an absolute right to have a jury of 12 people or a judge, one person, determine whether you are not guilty or guilty of this criminal charge at a speedy and public trial. Do you understand that?

A. Yes, I do, Your Honor.

Q. If you were to ask for a jury trial[,] before you can be found guilty of this charge, all 12 members of the jury must unanimously agree that you are guilty. Otherwise, you cannot be found guilty. You understand that?

A. Yes, sir.

Q. Also, at a trial, no matter what may have actually occurred, if the prosecution does not prove you are guilty of this charge beyond a reasonable doubt, you cannot be found guilty of this charge. Do you understand that?

A.  Yes, sir.

Q.  Also, at a trial, you will be able to see and hear all of the witnesses who come into court to present evidence or testify against you.  You, in this case since you don't have an attorney, would be able to ask questions of all of these witnesses who come into court.  You would be able to present your own witnesses, and you yourself could, but you do not have to, testify in your own defense.  Do you understand that?

A.  Yes, I do, Your Honor.

Q.  Do you have any questions about any of these rights that I have just explained to you?

A.  No, sir.

Q.  Do you understand that if the Court accepts your no contest plea, you will be giving up all of these rights . . . ?

A.  Yes, sir.

Q.  Are you willing to give up these rights?

A.  Yes, sir, I am.

Q.  Do you understand that if the Court accepts your no contest plea, the Court will find you guilty of the offense of Criminal Conspiracy as a Class C felony?

A.  Yes, sir.

Q.  And if the Court should find you guilty of Criminal Conspiracy, do you know what the maximum sentence is that the Court can impose upon you?

A.  Yes, sir.

Q.  What is it?

A.  I believe it's five years and five-thousand dollar fine.

Q.  Then you do understand that the Court can impose upon you a prison term of five years and, in addition, order you to pay a fine of $5,000?

A.  Yes, sir.

Q.  Any questions about that?

A.  No, sir.

Q.  Is there a probability of enhanced sentencing in this case, Mr. Carlisle?

MR.  CARLISLE:  No, Your Honor. There's only a single charge so he is not a multiple offender.  There's not a sufficient criminal history to support, in our opinion, a professional criminal status.  However, I do want to point out that it has been told to Mr. Merino on a number of times that the [prosecution] would be very avidly seeking a five-year term of incarceration; and based on what's happened to other family members, as well as the nature of these charges, the [prosecution] is satisfied there is a likelihood of that event so he does know that.

Although it is clear to us that we will not be seeking [an extended term], we do not feel the Court, even on its own, could . . . give him an extended term.

BY THE COURT:

Q.  Mr. Merino, based on what Mr. Carlisle has just told me, I understand that Mr. Carlisle has indicated to you that the [prosecution] will be requesting the Court to impose upon you . . . an indeterminate prison term[ ] of five years;  is that correct?

A.  Yes, sir.

Q.  Now, are you aware that in relation to similar charges . . ., two other Defendants have already been sentenced?

A.  Yes, I am aware of that, sir.

Q.  And those two were sentenced each to a five-year term of indeterminate imprisonment.  Are you aware of that?

A.  Yes, sir.

Q.  Are you aware that if you should fall into the same category, as these other two Defendants who have already been sentenced to imprisonment, there would be very little discretion on the part of the Court to treat you differently?  You understand that?

A.  Yes, I do, Your Honor.

Q.  In which case you would be given the same kind of sentence that has been given to other Defendants charged with similar offenses.  You understand that?

A.  Yes, sir.

Q.  That doesn't mean necessarily that that is what the Court will do, but barring any facts or circumstances presented to the Court which do not indicate that your participation was marginal compared to the two Defendants who were sentenced to

prison, the Court would in all likelihood treat you the same way as the Court treated the other two Defendants. Do you understand that?

A. Yes, sir.

Q. Knowing that and knowing what the maximum sentence could be in this case, do you still wish to plead no contest to this charge?

A. Yes, Your Honor.

Q. Mr. Carlisle, may I have the [prosecution's] offer of proof in relation to this charge, please.

MR. CARLISLE: The [prosecution] has evidence to show that beginning in 1978, members of the Merino gypsy clan in the State of [Hawai'i] played the Bujo, a centuries old confidence game that victimized the elderly or those with emotional problems.

In the Bujo, one of the female members of the Merino clan would tell the client that the future holds evil. Slight [sic] of hand tricks, such as removing a clump of hair from a newly broken egg, were used as evidence that a client was either possessed by an evil spirit or under the influence of a curse.

The female member of the Merino clan devised methods of extracting the victim's money. The victim may have been told that the money was the root of all evil, that it had to be tossed into the ocean or buried near a fresh grave in a graveyard, and credit cards were used on extravagant shopping sprees to purchase food, clothing, jewelry, and other merchandise for members of the Merino family's use and enjoyment.

Included as a victim in the Bujo conspiracy was Peter K. Pea, Jr. The Merinos obtained approximately $70,000.00 from Peter Pea by deception. Moreover, he was utilized essentially as a household servant, almost a slave for years and years by the clan. The deception utilized by the Defendants involved their convincing Mr. Pea, by the use of artifice and deception, that he was under a curse. And that the only way the curse could be removed was by his turning over to the Defendants large amounts of his own money.

Mr. Pea would also be taken to retain [sic: apparently "retail"] establishments and through the use of his American Express, Bank of Hawaii VISA, Central Pacific Bank VISA, Sears, Liberty House, J.C. Penney, and McInerny credit cards, would purchase numerous items for members of the family. Essentially, Mr. Pea would stand in one corner signing sales receipts while members of the family purchased hundreds and even thousands of dollars worth of goods.

During the course of the above-stated conduct, Eunice K. Pea, wife of Peter K. Pea for more than 40 years, continued to experience the depletion of the life savings that she and her husband had accumulated during their life together. Mrs. Pea has documented how, during the period between October 1, 1982 and February 21, 1983, she and the Pea household lost their entire life savings and had to mortgage their home to pay off creditors for huge bills incurred by the Merinos'·use of Peter's credit cards. The devastation caused to the life of Mrs. Pea and her household, due to the Merinos' manipulation and control of Peter Pea, culminated with her divorce from Peter on September 26, 1985, after 48 years and 7 months of marriage.

As a result of the theft of hundreds and hundreds and thousands and thousands of dollars from victims, including Mr. Pea, the Merino family ·was capable of living a lavish lifestyle. They lived in homes in some of the most prestigious residential locations on the island of Oahu, including the Portlock area of Hawaii Kai, Kalanianaole Highway located across from the Niu Shopping Center, Black Point near Diamond Head, and the Kahala Beach Apartments in Kahala. The family had access to expensive automobiles, including a Rolls Royce, Ferrari, Corvette, and a brand new recretional [sic] jeep. Servants of the family included Peter Pea, Esther Hernandez, Gertrude Horbas, Martha Horbas, and Phillip Horbas.

The [prosecution] has evidence showing that William Merino has an intimate knowledge and understanding of the gypsy scam. In a declaration of October 15,

1985, signed by William Merino, he describes the Bujo in detail. He admits knowing that the scam starts when people, mostly of elderly age who are confused and seek help, come to the reader who advertize[s] in newspapers, phone books and hand bills. He admits that the scam begins with the elderly client blieving [sic] that there is a curse on their money and personal belongings, often convinced by what is called the egg curse scam. He admits that then the gypsy reader attempts to obtain homes, cars, jewelry, or anything else of real value from the client who is frightened and believes all possession[s] have a curse.

He further admitted that when the victims finally go to the police department, rarely is action taken. Through the establishment of a relationship between members of the gypsy family and governmental agencies, little, if anything, happens concerning the scams.

The [prosecution] can produce evidence to show that William Merino[ ] at times took advantage of the residences in Hawaii Kai, Black Point and on Kalanianaole Highway across from Niu Shopping Center. He benefitted from the services of the Horbas children and Peter Pea.

He also had access to and utilized the Rolls Royce and the Ferrari. The goods and merchandise that were received from some of the victims were in his possession and control.

The [prosecution] also anticipates it can prove that William Merino occupies the position known as Rombaro of the Merino clan. The Rombaro, or king of the clan as it is known to outsiders, has the job of settling disputes, both within the clan and between family members and outsiders, especially the law.

William Merino did attempt to establish contacts and relationships with governmental agencies to resolve the matters short of criminal prosecution. In doing so, the evidence will show that he was in effect running interference for the female members of the Merino family so that they could continue in their criminal enterprise. As a result of this evidence, there is suffi-cient evidence to prove that William Merino and his wife and children are guilty of the offense of Conspiracy to Commit Theft in the First Degree.

. . . .

THE COURT: Is the [prosecution] presently prepared to present witnesses and evidence to substantiate those allegations?

MR. CARLISLE: Yes, Your Honor.

THE COURT: Thank you, Mr. Carlisle.

At the conclusion of the prosecution's offer of proof, Merino confirmed that he was not being forced, threatened, or pressured by anyone or anything to plead no contest to the criminal conspiracy charge and that he wished to enter his plea of his own free will.

Judge Tsukiyama then inquired of Carlisle as to whether the parties had entered into a plea agreement. Carlisle represented that the prosecution and Merino had agreed that, in exchange for Merino's no contest plea to the new complaint, the prosecution had agreed to nolle prosequi Cr. No. 86–0990 as it applied to Merino and to take no position before the Hawai'i Paroling Authority regarding further disposition of the present matter in the event that the court sentenced Merino to a five-year indeterminate term of imprisonment. In response to Judge Tsukiyama's questions, Merino confirmed that (1) the plea agreement as characterized was accurately reflected on the no contest plea form, (2) he had reviewed it, (3) the written description included the entire plea agreement, (4) no promises or offers of leniency had been made in return for his no contest plea, (5) he understood that the court was not a party to the agreement, was not bound thereby, and was making no commitments to him in return for his plea, (6) he ratified the statement, appearing in the no contest plea form, that he was "satisfied that [he was] competent to represent [him]self without the services of an attorney and [had] previously waived [his] right to counsel," (7) the statement was correct, (8) he had signed and dated the form, (9) he had read the contents of the form before he signed it, (10) he had no questions regarding anything appearing on the form, (11) he understood the form and

its contents,[7] and (12) he was willing to sign the written statement at the end of the form reflecting that the court had questioned him personally in open court to insure that he understood what he was doing in pleading no contest and that he further understood the form and its contents.

Merino signed and dated the acknowledgment, advised Judge Tsukiyama that he had no questions about anything that had transpired in court, that he did not wish to discuss anything further with the prosecution, that there was nothing that he wished to ask an attorney before the court proceeded, and that he was prepared to enter his plea.

Merino then formally entered his plea of no contest to the new complaint. Having done so, Judge Tsukiyama found that Merino had "voluntarily entered his no contest plea to the charge of Criminal ·Conspiracy as a Class C felony with a full and complete understanding of the nature of that charge . . . and of the consequences of his no contest plea thereto."

Accordingly, Judge Tsukiyama found and adjudged Merino guilty of criminal conspiracy as a class C felony, referred the matter to the Adult Probation Division for a presentence diagnosis and report, ordered Merino to appear before him for sentencing on November 14, 1988, and set bail in the aggregate amount of $2200.00 as to Cr. Nos. 86–0990 and 88–1485.

### B. *The Motion To Withdraw No Contest Plea*

Merino's case did not proceed smoothly subsequent to August 29, 1988. Instead, a halting and protracted series of events ensued, which we summarize as follows:

*November 14, 1988:* Merino does not appear for sentencing, alleging, through counsel (Peter Donahoe), that he is hospitalized in California. At prosecution's request, court orders issuance of a bench warrant for Merino's arrest, but stays execution until November 18, 1988 to permit documentation of Merino's confinement. Bail set at $50,000.00.

*November 18, 1988:* Court further stays execution of bench warrant to November 21, 1988.

*November 21, 1988:* Court receives documentation of Merino's hospitalization, sets bench warrant aside, and reschedules sentencing for December 22, 1988. Both prosecution and Merino advised.

*December 14, 1988:* Via telephone call, Merino advises that he is unable to travel to Hawaiʻi due to physical condition and requests continuance. Court informs Merino that medical verification required. Prosecution notified.

*December 22, 1988:* Sentencing continued due to court's illness. Letter, dated December 13, 1988, from Merino's physician received. Prosecution notified.

*December 27, 1988:* Based on letter from Merino's physician, sentencing continued to January 18, 1989.

*January 18, 1989:* Due to rescheduling of Merino's pending surgery, sentencing continued to February 28, 1989. Prosecution notified.

*February 27, 1989:* Due to Merino's recuperation from surgery, sentencing continued to March 29, 1989. Prosecution notified.

*March 29, 1989:* Due to Merino's inability to travel for medical reasons, sentencing continued to April 14, 1989. Prosecution notified.

---

**7.** Item 6 appearing on the no contest plea form contained the following preprinted statement:

> I know that I still have the right to plead not guilty and have a trial by jury or by the court in which the government will be required to prove me guilty beyond a reasonable doubt. I know that in a trial, I can see, hear and question the witnesses who may testify against me, I can call my own witnesses to testify for me, and I do not have to take the stand and testify if I do not wish to do so. I know that I have a

right to a speedy and public trial. I know that by pleading in this matter, I am giving up my right to a trial and may be found guilty and sentenced without a trial of any kind. *I plead in this manner because (give brief factual statement of what defendant did):*

(Emphasis added.) Under the preprinted colon, the following statement was typed in the space provided: *"I do not wish to contest the government's charges against me in this case."* (Emphasis added.)

*April 11, 1989:* For same reason, sentencing continued to June 15, 1989. Prosecution notified.

*June 12, 1989:* For same reason, sentencing continued to July 11, 1989.

*July 11, 1989:* Merino does not appear. Court receives presentence diagnosis and report. Through new counsel (Richard Kawana), Merino orally moves to withdraw no contest plea and to continue sentencing date. Court denies both motions. At prosecution's request, bench warrant issued without bail.

*July 12, 1989:* Through counsel, Merino files written motion to withdraw no contest plea, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 32(d).

*August 2, 1989:* Court orders Merino to appear with counsel on August 4, 1989, for hearing on motion to withdraw no contest plea.

*August 4, 1989:* Merino does not appear. Counsel requests continuance. Prosecution objects. Court issues bench warrant and sets bail at $50,000.00.

*May 25, 1990:* Merino appears with counsel pursuant to return on bench warrant. Court confirms bail in amount of $50,000.00 on both criminal contempt and criminal conspiracy charges, on condition that Merino sign waiver of extradition and remain within City and County of Honolulu unless otherwise authorized by court. Hearing on motion to withdraw no contest plea continued to June 1, 1990.

*June 1, 1990:* Hearing continued to June 22, 1990.

*June 22, 1990:* Merino appears with counsel for hearing on motion to withdraw no contest plea and sentencing. Court hears testimony. Matter continued to August 24, 1990. Merino ordered to appear.

*August 24, 1990:* Merino appears with counsel. By agreement of parties, matter continued to September 28, 1990. Merino ordered to appear.

*September 28, 1990:* Merino appears with counsel. Court conducts hearing on motion to withdraw no contest plea. Fur-

ther testimony taken. Matter continued to October 2, 1990.

*October 2, 1990:* Merino appears with attorneys Richard Kawana and Michael Green. Green advises court that he may be substituting as defense counsel for Kawana. Matter continued to November 2, 1990. Merino ordered to appear.

*November 2, 1990:* Merino appears with new counsel (Green). Testimony further to motion to withdraw no contest plea concluded. Court enters oral findings of fact (FOF), conclusions of law (COL), and order denying the motion. Sentencing continued to November 23, 1990. Merino ordered to appear. Court sets bail at $100,000.00.

*November 23, 1990:* Merino not present due to hospitalization. Matter continued to December 6, 1990. Green ordered to notify Merino.

*December 6, 1990:* Merino does not appear and whereabouts unknown. Court orally orders forfeiture of bail, resets bail at $500,000.00, and issues bench warrant.

*February 18, 1992:* Merino appears *pro se* pursuant to return on bench warrant. Court confirms bail at $500,000.00 (increased to $1,000,000.00 on March 3, 1992) and orders Merino to appear for sentencing on March 12, 1992, with privately retained or court-appointed counsel.

*February 21, 1992:* Court files written FOF, COL, and order denying Merino's motion to withdraw no contest plea.

■ In support of his written motion to withdraw no contest plea, Merino claimed in substance that (1) his capacity to exercise sound judgment had been impaired—medically and otherwise—at the time he entered his plea on August 29, 1988, (2) he had not knowingly and intelligently waived his right to counsel at all critical stages of the proceeding, as reflected by his failure "fully and clearly [to] understand the implications of his no contest plea or of the waiver of his right to counsel," and (3) he was innocent of the offense charged in the new complaint, (4) which, in any event, lacked any factual basis.[8] As noted, the circuit court orally denied Merino's motion at the conclusion of three days

---

8. Merino also maintained that he should be allowed to withdraw his no contest plea because a felony record would preclude him from becoming a permanent delegate to a United Nations

of hearings and, following Merino's absconding and rearrest over a year later, entered written FOF, COL, and an order memorializing its oral decision.

Merino was sentenced on March 12, 1992, almost three-and-a-half years after the entry of his no contest plea, *inter alia*, to an indeterminate five-year term of imprisonment. The next day, he filed his notice of appeal to this court.

## II. STANDARD OF REVIEW

"The [trial] court is vested with wide discretion to accept or refuse a nolo contendere plea," *State v. Medeiros*, 8 Haw. App. 39, 43, 791 P.2d 730, 733, *cert. denied*, 71 Haw. 669, 833 P.2d 901 (1990) (emphasis deleted),[9] and the acceptance or refusal of a no contest plea is therefore reviewed for abuse of that discretion. The denial of an HRPP 32(d) motion to withdraw a plea of nolo contendere, or "no contest," prior to the imposition of sentence is likewise reviewed for abuse of discretion. *State v. Gomes*, 79 Hawai'i 32, 36, 897 P.2d 959, 963 (1995) (quoting *State v. Adams*, 76 Hawai'i 408, 411, 879 P.2d 513, 516 (1994) (citation omitted)); *see also State v. Costa*, 64 Haw. 564, 565, 644 P.2d 1329, 1331 (1982); *State v. Smith*, 61 Haw. 522, 523, 606 P.2d 86, 88 (1980); *State v. Jim*, 58 Haw. 574, 577, 574 P.2d 521, 523 (1978). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Gomes*, 79 Hawai'i at 36, 897 P.2d at 963 (quoting *Adams*, 76 Hawai'i at 411, 879 P.2d at 516 (citation omitted)) (internal quotation marks omitted).

## III. DISCUSSION

**A. The Circuit Court Did Not Commit An Abuse Of Discretion When It Accepted Merino's No Contest Plea.**

Nolo contendere, or "no contest," is defined as a "[t]ype of plea which may be entered with leave of court to a criminal complaint or indictment by which *the defendant does not admit or deny the charges*, though a fine or sentence may be imposed pursuant to it. The principal difference between a plea of guilty and a plea of nolo contendere is that the latter may not be used against the defendant in a civil action based upon the same acts. . . ."

*Gomes*, 79 Hawai'i at 33 n. 3, 897 P.2d at 960 n. 3 (quoting *Black's Law Dictionary* 1048 (6th ed. 1990) (citation omitted)) (some emphasis added and some deleted). By contrast, a guilty plea is a "[f]ormal *admission in court as to guilt of having committed [a] criminal act charged* which a defendant may make if he or she does so intelligently and voluntarily[.]" *Black's Law Dictionary* at 708 (emphases added).

Bearing in mind the "wide discretion" with which trial courts are vested in accepting or refusing no contest pleas, *Medeiros*, 8 Haw. App. at 43, 791 P.2d at 733, we now consider each of Merino's claims.

### 1. The new complaint was not "fatally defective."

Merino urges that the circuit court committed plain error by accepting his no contest plea to the offense of criminal conspiracy on the basis that the charging complaint was fatally defective in that it "fail[ed] to sufficiently allege the elements of conspiracy." Specifically, Merino submits that the complaint failed sufficiently to allege that he "agreed with anyone for any purpose," much less that, with intent to promote or facilitate the commission of theft in the first degree, he agreed with a co-conspirator or co-conspirators that one or more of them would engage in or solicit the conduct or cause or solicit the result specified by the definition of

Holocaust Committee. It is clear from the record that the prosecution's characterization of this claim as "speculative, a wish or [a] dream" was persuasive and that the circuit court, as the finder of fact, was entitled to reject Merino's claim. Accordingly, we will not discuss it further.

9. In *Schutter v. Soong*, 76 Hawai'i 187, 208, 873 P.2d 66, 87 (1994), this court overruled *Medeiros* "insofar as it [held] that the denial of the right to pre-sentence allocution may be cured later at a hearing to reconsider the sentence." We left *Medeiros* otherwise intact, and the subject of presentence allocution is not at issue in the appeal before us.

theft in the first degree, as defined by HRS §§ 708–831(1)(b) and 708–830(2). *See* HRS § 705–520, *supra* note 4. Based on the following analysis, we disagree.

■■■■ It is well settled that an "accusation must sufficiently allege all of the essential elements of the offense charged," a requirement that "obtains whether an accusation is in the nature of an oral charge, information, indictment, or complaint[.]" *State v. Jendrusch*, 58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977). Put differently, the sufficiency of the charging instrument is measured, *inter alia*, by "whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he [or she] must be prepared to meet[.]" *State v. Wells*, 78 Hawai'i 373, 379–80, 894 P.2d 70, 76–77 (1995) (citations and internal quotation marks omitted) (brackets in original). "A charge defective in this regard amounts to a failure to state an offense, and a conviction based ·upon it cannot be sustained, for that would constitute a denial of due process." *Jendrusch*, 58 Haw. at 281, 567 P.2d at 1244 (citations omitted). "Whether an indictment [or complaint] sets forth all the essential elements of [a charged] offense ... is a question of law," which we review under the *de novo*, or "right/wrong," standard. *Wells*, 78 Hawai'i at 379, 894 P.2d at 76 (citations omitted).

■■■■ The failure of an accusation to charge an offense may be raised "at any time during the pendency of the proceedings[.]" HRPP 12(b)(2) (1995); *see also State v. Motta*, 66 Haw. 89, 90, 657 P.2d 1019, 1019–20 (1983). However this court has

adopted the rule [hereinafter, the "*Motta/Wells* post-conviction liberal construction rule"] followed in most federal courts of liberally construing indictments [and complaints] challenged for the first time on appeal. *Motta*, 66 Haw. at [90–]91, 657 P.2d at 1020. Elaborating on this standard, this court [will] "not reverse a con-

viction based upon a defective indictment [or complaint] unless the defendant can show prejudice or that the indictment [or complaint] cannot within reason be construed to charge a crime." *Id.*

*Wells*, 78 Hawai'i at 381, 894 P.2d at 78.

■■■■ On the record before us, Merino fails to meet his burden with respect to both prongs of the *Motta/Wells* post-conviction liberal construction rule. With respect to the first prong, and assuming, *arguendo*, the presence of a substantive defect in the new complaint charging him with criminal conspiracy, Merino has not even alleged, much less demonstrated, any prejudice resulting therefrom. If anything, he has benefitted from the new complaint. By negotiating the dismissal of the original charge of extortion in the first degree, a class B felony, *see supra* note 2, punishable by an indeterminate ten-year prison term, *see* HRS § 706–660(1) (1993), in exchange for his no contest plea to criminal conspiracy as a class C felony, *see supra* notes 4 and 5, punishable by an indeterminate five-year prison term, *see* HRS § 706–660(2) (1993), Merino has succeeded in eliminating the risk of an additional five years of incarceration. Moreover, Merino can hardly claim prejudicial surprise resulting from the consequences of his plea of no contest to the new complaint; the plea agreement placed him on actual notice that the prosecution would be seeking an indeterminate five-year prison term, and the sentencing court expressly advised him, prior to the entry and acceptance of his plea, that— barring unforeseen facts and circumstances reflected in the impending presentence diagnosis and report from the Adult Probation Division—it fully intended to sentence him accordingly. Finally, given Merino's exploitative manipulation and protraction of the sentencing process following the entry and acceptance of his no contest plea, described *supra* in section I.B. of this opinion, we believe that any such suggestion of prejudice would constitute the height of chutzpa.[10]

---

10. "Chutzpa" is a Yiddish word that means "unmitigated effrontery or impudence." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 265 (1989). It has also been defined to mean "gall, brazen nerve, effrontery,

incredible 'guts'; presumption-plus-arrogance such as no other word, and no other language, can do justice to." L. Rosten, *The Joys of Yiddish* 92 (1968). "*Chutzpa* is that quality enshrined in a man who, having killed his mother

■ Regarding the second prong of the *Motta/Wells* post-conviction liberal construction rule, it is apparent that the new complaint can, "within reason," be construed to charge the offense of criminal conspiracy. In this respect, we look to the commentary to the Hawai'i Penal Code (HPC), HRS Title 37, as an aid in understanding the terms of HRS § 705-520. *See State v. Holbron*, 80 Hawai'i 27, 40 n. 20, 904 P.2d 912, 925 n. 20 (1995); *State v. Gaylord*, 78 Hawai'i 127, 139, 890 P.2d 1167, 1179 (1995).[11]

The commentary on HRS § 705-520 states in relevant part:

... [T]he [HPC] focuses on a given defendant and states what conduct on the defendant's part is sufficient to establish the defendant's liability for criminal conspiracy. Group liability is not necessary. The actor's agreement does not require a "meeting of the minds" with one or more other persons; the [HPC] does not require that at least two persons be guilty of a criminal conspiracy. The "agreement" on the part of a "co-conspirator" might be feigned; but this has no bearing on the defendant's individual liability....

....

The [HPC] requires that the culpability sufficient to establish liability for criminal conspiracy be intent to promote or facilitate the commission of a crime....

Furthermore, regardless of the state of mind required by the definition of a substantive offense to establish culpability with respect to proscribed conduct or results, the [HPC] requires intentional behavior for conspiracy....

....

... The agreement required by the [HPC] is a consensus,[12] which need not, of course, be formal or, indeed, explicit in the sense that it is put into words....

... The [HPC] requires that an overt act be done in pursuance [of] a conspiracy.... The [HPC] imposes this ... requirement because the inchoate nature of the offense requires some indicia of a settled intention. The overt act need not be a substantial step as defined in [HRS] § 705-500 [governing criminal attempt liability, *see Holbron*, 80 Hawai'i at 40-41, 904 P.2d at 925-26] but may be any act in pursuance of the conspiratorial purpose.

(Footnote and some internal quotation marks omitted.)

The new complaint charged Merino with committing criminal conspiracy, in violation of HRS § 705-520, *see supra* note 4, to commit theft in the first degree, in violation of HRS §§ 708-831(1)(b) and 708-830(2), *see supra* notes 5 and 6. Specifically, the new complaint charged, in substance, that Merino, with intent to promote or facilitate the commission of theft in the first degree, agreed with one or more persons, including the enumerated co-conspirators, that they or one or more of them would obtain or exert control over the property of another, the value of which exceeded $200.00, by deception and with intent to deprive the other of the property and that, in "pursuance" of the conspiracy, Merino or one or more of the enumerated co-conspirators committed an overt act, including obtaining or exerting control over money, merchandise, and services of Peter Pea, Jr., the value of which exceeded $200.00, by deception and with intent to deprive Peter Pea, Jr. of them and attempting to establish contacts and relationships with government agencies in order to permit one or more of the co-conspirators to continue to pursue the conspiracy.

Pertinent to the new complaint, HRS § 702-204 (1993) provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, know-

---

and father, throws himself on the mercy of the court because he is an orphan." *Id.*

**11.** *See* HRS § 701-105 (1993) ("The commentary accompanying [the HPC] ... may be used as an aid in understanding [its] provisions ..., but not as evidence of legislative intent."); *cf. State v. Alo*, 57 Haw. 418, 426-27, 558 P.2d 1012, 1017 (1976) (HPC commentary, while not evidence thereof, "is nevertheless expressive of ... legisla-

tive intent"), *cert. denied*, 431 U.S. 922, 97 S.Ct. 2193, 53 L.Ed.2d 235 (1977).

**12.** *Cf. State v. Senteno*, 69 Haw. 363, 367, 742 P.2d 369, 372 (1987) (noting that "the conspiracy statute (HRS § 705-520) speaks in terms of agreements among co-conspirators") (emphasis deleted)).

ingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." HRS § 702-205 (1993) enumerates the elements of an offense to include "such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as ... [a]re specified by the definition of the offense[.]" And "'HRS § 701-114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense.'" State v. Wallace, 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (quoting Holbron, 80 Hawai'i at 39, 904 P.2d at 924).

Accordingly, there were two material elements of the offense of criminal conspiracy in violation of HRS § 705-520 and as charged in the new complaint against Merino, each of which the prosecution would have been required to prove beyond a reasonable doubt, had the matter proceeded to trial, in order to establish guilt. These two material elements were: (1) that Merino, (a) with intent to promote or facilitate the commission of theft in the first degree (i.e., the overarching requisite conspiratorial state of mind relating to the commission of · an underlying predicate offense—in this case, theft in the first degree—see HRS § 705-520, supra note 4), (b) agreed (i.e., part of the prohibited conduct requiring a conspiratorial agreement, see HRS § 705-520(1), supra note 4), (c) with one or more persons, including the enumerated co-conspirators (i.e., the specified attendant circumstance that the agreement be by "consensus," see id. and commentary on HRS § 705-520), (d) that they, or one or more of them, would obtain or exert control over the property of another (i.e., part of the prohibited conduct relating to the promotion or facilitation of the commission of an underlying predicate offense—in this case, theft, see HRS §§ 705-520(1), supra note 4, and 708-830(2), supra note 6), (e) the value of which exceeded $200.00 (i.e., a specified circumstance attendant to the underlying predicate offense—theft in the first degree—regarding the value of the property in question, see HRS § 708-831(1)(b), supra note 5), (f) by deception (i.e., part of the prohibited conduct entailing the commission of the underlying predicate offense—in this case, theft, see

HRS § 708-830(2), supra note 6), and (g) with intent to deprive the other of the property (i.e., the requisite state of mind, as well as the specified result of conduct, with respect to the underlying predicate offense—in this case, theft, see id.); and (2) that Merino and/or one or more of the enumerated co-conspirators, (a) with intent to promote or facilitate the commission of theft in the first degree (see element 1(a), supra ), (b) committed an overt act or acts in pursuance of the conspiracy (i.e., part of the prohibited conduct, see HRS § 705-520(2), supra note 4) by (i) exerting control over money, merchandise, and services of Peter Pea, Jr. (see element 1(d), supra ), the value of which exceeded $200.00 (see element 1(e), supra ), by deception (see element 1(f), supra ), and with intent to deprive Peter Pea, Jr. of them (see element 1(g), supra ), and (ii) attempting to establish contacts and relationships with government agencies in order to permit one or more of the enumerated co-conspirators to continue to pursue the conspiracy (i.e., part of the prohibited conduct requiring the commission of an overt act "in pursuance of the conspiratorial purpose," see HRS § 705-520(2), supra note 4, and commentary on HRS § 705-520).

Thus analyzed, it is apparent that the new complaint essentially tracked the language of the criminal conspiracy statute, HRS § 705-520, while at the same time specifically identifying theft in the first degree as the underlying predicate offense, the commission of which Merino allegedly intended to promote or facilitate, and describing with particularity the overt acts allegedly committed in pursuance of the conspiratorial purpose.

In this context, we have established the following general rule [hereinafter, "the Torres/Schroeder rule"]:

> [W]here the statute sets forth with reasonable clarity all essential elements of the crime intended to be punished, and fully defines the offense in unmistakable terms readily comprehensible to persons of common understanding, a charge drawn in the language of the statute is sufficient.

*State v. Schroeder*, 76 Hawai'i 517, 529, 880 P.2d 192, 204 (1994) (quotation marks omitted) (quoting *State v. Torres*, 66 Haw. 281, 288–89, 660 P.2d 522, 527 (1983)).

*State v. Israel*, 78 Hawai'i 66, 73, 890 P.2d 303, 310 (1995).

Although the *Torres/Schroeder* rule "does not apply in ... cases ... where the definition of an offense ... includes generic terms" and, rather than "stat[ing] the species ... [and] descend[ing] to particulars," the indictment or complaint merely "charge[s] the offense in the same generic terms as in the definition," *Israel*, 78 Hawai'i at 73, 890 P.2d at 310 (citations omitted) (some ellipsis points and brackets in original and some added), the rule clearly applies in the present case.[13] As demonstrated above, the new complaint alleged "with reasonable clarity" all of the material elements of criminal conspiracy "in unmistakable terms readily comprehensible to persons of common understanding."

Moreover, Merino's claim that the new complaint failed sufficiently to allege that Merino agreed with others to cause the result specified by the relevant theft statutes is mistaken. The new complaint expressly charged, *inter alia*, that Merino, with intent to promote or facilitate the commission of theft in the first degree, agreed with the enumerated co-conspirators "that they or one or more of them ... would cause or solicit the result specified by ... [HRS §§ ] 708–831(1)(b) and 708–830(2)." Merino's apparent suggestion that the new complaint was required to couch the allegation of a conspiratorial agreement in terms of specific conduct or overt acts on his part is simply wrong. Once Merino's agreement—"which [did not] need ... [to] be formal or, indeed, explicit in the sense that it [was] put into words," *see* commentary on HRS § 705–520—was alleged, it was not necessary that there be any allegation that Merino, personally, committed "an overt act ... in pursuance [of the] conspiracy," so long as an overt act by *some* co-conspirator was alleged. *See* HRS § 705–520(2), *supra* note 4. In any event, the new complaint attributed both enumerated overt acts, at least in part, to Merino, and each of them was "in pursuance of the conspiratorial purpose." *See* commentary on HRS § 705–520.

We hold that the new complaint sufficiently alleged all of the material elements of the offense of criminal conspiracy and, therefore, was not "fatally defective."

2. *Notwithstanding that HRPP 11(f) does not require the determination of the accuracy of a no contest plea, the circuit court was entitled, pursuant to HRPP 11(b), to insist upon a factual basis sufficient to satisfy it that the views of the parties and the interest of the public in the effective administration of justice warranted the acceptance of Merino's no contest plea.*

■ Merino next contends that the circuit court erred in accepting his no contest plea "because the [prosecution's] offer of proof, i.e., the factual basis for the plea, did not specifically show that Merino engaged in criminal conspiracy to commit Theft in the First Degree." Merino's contention, of course, assumes that a "factual basis" is a necessary precondition to the acceptance of a no contest plea. As we will demonstrate below, it is not.

We note at the outset that Merino tendered, and the circuit court accepted, his no contest plea pursuant to HRPP 11 (1988),[14] which provided in relevant part:

**Rule 11.  PLEAS**

(a) **Alternatives.** A defendant may plead <u>not guilty, guilty, or nolo contendere.</u> If a defendant refuses to plead or if the court refuses to accept a plea of <u>guilty or nolo contendere</u> ..., the court shall enter a plea of <u>not guilty.</u>[15]

---

13. Pursuant to *Israel*, the new complaint would have failed sufficiently to allege a criminal conspiracy, pursuant to HRS § 705–520, had it failed to identify theft in the first degree as the underlying predicate offense. If no overt acts had been described, the new complaint would, at the very least, have been vulnerable to a motion for a bill of particulars.

14. The quoted portions of HRPP 11 remain the same to this day, except as noted *infra*.

15. In 1993, this paragraph was redenominated as HRPP 11(a)(1), entitled **"In General."** A new subsection, HRPP 11(a)(2) was added to permit defendants, with the approval of the court and the consent of the prosecution, to enter condi-

**(b) Nolo Contendere.** A defendant may plead <u>nolo contendere</u> only with the consent of the court. Such a plea shall be accepted by the court only after due consideration of the views of the parties and the interest of the public in the effective administration of justice.

**(c) Advice to Defendant.** The court shall not accept a plea of <u>guilty or nolo contendere</u> without first addressing the defendant personally in open court and determining that he understands the following:

(1) the nature of the charge to which the plea is offered; and

(2) the maximum penalty provided by law, and the maximum sentence of extended term of imprisonment, which may be imposed for the offense to which the plea is offered; and

(3) that he has the right to plead not guilty, or to persist in that plea if it has already been made; and

(4) that if he pleads <u>guilty or nolo contendere</u> there will not be a further trial of any kind, so that by pleading <u>guilty or nolo contendere</u> he waives the right to a trial.[16]

**(d) Insuring That the Plea Is Voluntary.** The court shall not accept a plea of <u>guilty or nolo contendere</u> without first addressing the defendant personally in open court and determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead <u>guilty or nolo contendere</u> results from any plea agreement.

**(e) Plea Agreement.**

(1) **In General.** The prosecutor and counsel for the defendant, <u>or the defendant when acting pro se,</u> may enter into plea agreements that, upon the entering of a plea of <u>guilty or nolo contendere</u> to a charged offense ..., the prosecutor will take certain actions or adopt certain positions, including the dismissal of other charges and the recommending or not opposing of specific sentences or dispositions on the charge to which a plea was entered. The court shall not participate in discussions leading to such plea agreements nor be bound thereby.[17]

(2) **Notice of Plea Agreement.** Any plea agreement shall be disclosed by the parties to the court at the time the defendant tenders his plea. . . .

(3) **Warning to Defendant.** Upon disclosure of any plea agreement, the court shall not accept the tendered plea unless the defendant is informed that the court is not bound by such agreement.[18]

. . . .

**(f) Determining Accuracy of Plea.** Notwithstanding the acceptance of a plea of <u>guilty,</u> the court shall not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

(Underscoring added.)

■■■ The organization of HRPP 11 is significant. HRPP 11(a), the general prefatory subsection, catalogs the three plea options—not guilty, guilty, and nolo contendere—available to a defendant. HRPP 11(b), on its face, is limited in scope to nolo contendere (*i.e.*, no contest) pleas and delineates the considerations—namely, "the views of the parties and the interest of the public in the effective administration of justice"—that the

---

tional pleas of guilty or nolo contendere, "reserving in writing the right, on appeal from the judgment, to seek review of the adverse determination of any specified pretrial motion." The amendment allows "[a] defendant who prevails on appeal ... to withdraw the plea."

**16.** Effective September 2, 1988, subsection (5) was added to HRPP 11(c), which requires the trial court further to advise the defendant "that if he is not a citizen of the United States, a conviction of the offense for which he has been charged may have the consequences of deportation, exclusion from admission to the United States, or

denial of naturalization pursuant to the laws of the United States."

**17.** In 1993, the last sentence of HRPP 11(e)(1) was deleted and the following sentence substituted for it: "The court may participate in discussions leading to such plea agreements and may agree to be bound thereby."

**18.** In 1993, the phrase "unless the court agreed otherwise" was added to the end of HRPP 11(e)(3).

court must address before consenting to and accepting such pleas. HRPP 11(c) and (d), relating on their face to pleas of guilty *and* nolo contendere, implement the "constitutional requirement that a trial judge ensure that a ... plea be voluntarily and knowingly entered." *State v. Dicks,* 57 Haw. 46, 49, 549 P.2d 727, 730 (1976) (citations omitted); *see also State v. Vaitogi,* 59 Haw. 592, 597–98, 585 P.2d 1259, 1262–63 (1978); *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969). In particular, HRPP 11(c), by its terms, is designed to insure that a defendant's guilty or nolo contendere plea is entered with knowledge and understanding of its consequences, while HRPP 11(d), by its terms, is similarly designed to ensure that a defendant's guilty or nolo contendere plea is entered voluntarily. HRPP 11(e) also relates on its face to guilty *and* nolo contendere pleas and prescribes the steps to be followed in disclosing to the court and memorializing for the record the terms of plea agreements between a defendant and the prosecution, as well as insuring, as appropriate, that the defendant understands that the court is not bound by the agreement. Pursuant to HRPP 11(f), which is key to Merino's appeal,

> the court is prohibited from entering judgment upon a *guilty* plea if it is not subjectively satisfied that there is a factual basis for the plea. The court must satisfy itself that the conduct *which the defendant admits* constitutes the offense charged in the indictment[, complaint,] or information or an offense included therein to which the defendant has pleaded *guilty.* While the factual basis may come from various sources, it must appear on the record.

*State v. Teves,* 4 Haw.App. 566, 569, 670 P.2d 834, 837 (1983) (citations and internal quotation marks omitted) (emphases added).[19]

The absence of any reference to nolo contendere pleas in HRPP 11(f)—in the face of the express incorporation of such pleas within the scope of HRPP 11(a), (b), (c), (d), and (e)—gives rise to the question whether the circuit court was under any *obligation* to ascertain a "factual basis" for Merino's no contest plea to criminal conspiracy. A well settled canon of statutory construction,[20] the history underlying the promulgation of HRPP 11(f), and the appellate case law of this jurisdiction all suggest a negative answer.

"[T]he canon of construction denominated *noscitur a sociis* ... may be freely translated as 'words of a feather flock together,' that is, the meaning of a word is to be judged by the company it keeps." *State v. Aluli,* 78 Hawai'i 317, 321, 893 P.2d 168, 172 (1995) (quoting *State v. Deleon,* 72 Haw. 241, 244, 813 P.2d 1382, 1384 (1991)) (some internal quotation marks omitted). Application of this canon to HRPP 11 suggests that the various sections of the rule apply exclusively to the types of pleas expressly enumerated in them. Notwithstanding that "[i]n almost every respect the plea of nolo contendere resembles the plea of guilty," 1 C. Wright, *Federal Practice and Procedure: Federal Rules of Criminal Procedure* § 177, at 664 (2d ed. 1982) [hereinafter, 1 Wright], they are not identical; although each culminates in a criminal conviction, a defendant, by pleading guilty, admits to having unlawfully engaged in the charged criminal conduct, whereas, by pleading no contest, he or she neither admits to nor denies having done so, but rather chooses not to contest the charge to which the plea is entered. *Gomes,* 79 Hawai'i at 33 n. 3, 897 P.2d at 960 n. 3; *Medeiros,* 8 Haw.App. at 42–44, 791 P.2d at

---

**19.** In instances "where a tendered plea of *guilty* is accompanied by a contemporaneous denial of the acts constituting the crime charged," this court has ruled that

> a searching inquiry addressed to the defendant personally, to ensure the defendant's complete understanding of the finality of his *guilty* plea if accepted, should be conducted by the trial court before accepting the plea. Only then, and *only after satisfying itself that there is a strong factual basis for the plea,* ought the trial court accept the plea.

*State v. Smith,* 61 Haw. 522, 524–25, 606 P.2d 86, 89 (1980) (emphases added).

**20.** HRS § 602–11 (1993) provides in relevant part that "[t]he supreme court shall have power to promulgate rules in all civil and criminal cases for all courts relating to process, practices, procedure and appeals, *which shall have the force and effect of law."* (Emphasis added.) HRPP 11 is such a rule. Having the force and effect of law, it is analogous to a statute.

733–34; *Teves,* 4 Haw.App. at 569, 670 P.2d at 837. Accordingly, pursuant to the *noscitur a sociis* doctrine, if this court had intended HRPP 11(f) to apply to nolo contendere pleas, it would not have expressly limited the section's subject matter to guilty pleas.

Moreover, HRPP 11(f) was patterned after Federal Rules of Criminal Procedure (FRCP) Rule 11(f), *Medeiros,* 8 Haw.App. at 43, 791 P.2d at 733, which in turn substantially adopted the formulation recommended by the federal Advisory Committee on Criminal Rules.

> At one time in the past the Advisory Committee on Criminal Rules proposed that a plea of nolo contendere not be accepted without the court first satisfying itself that the defendant committed the crime charged. This overlooked the fact that an innocent defendant may not wish to contest the charge and that the nolo plea is a means for him [or her] to do this. Accordingly that proposal was not adopted and *Rule 11(f), requiring the court to determine the accuracy of a plea, applies to guilty pleas but not to pleas of nolo contendere.*

1 Wright § 177, at 670–71 (footnotes omitted) (emphasis added); *see also North Carolina v. Alford,* 400 U.S. 25, 35–36 n. 8, 91 S.Ct. 160, 166–67, 27 L.Ed.2d 162 (1970) ("Throughout its history, ... the plea of *nolo contendere* has been viewed not as an express admission of guilt but as a consent by the defendant that he [or she] may be punished as if he [or she] were guilty.... [FRCP] 11 preserves this distinction in its requirement that a court cannot accept a guilty plea 'unless it is satisfied that there is a factual basis for the plea'; there is no similar requirement for pleas of *nolo contendere,* since it was thought desirable to permit defendants to plead *nolo* without making any inquiry into their actual guilt." (Citation omitted)).

By implication, the appellate case law of Hawai'i has recognized that, as is true of FRCP 11(f), HRPP 11(f) does not *require* the court to satisfy itself that there is a "factual basis" for the entry and acceptance of a no contest plea. In *Medeiros,* after having initially pled not guilty to theft in the fourth degree, the defendant sought, in the midst of trial, to change her plea to no contest in exchange for the prosecution's agreement to recommend a fifty dollar fine by way of sentence. The trial court insisted on a factual basis for the plea and, dissatisfied with the offer, rejected it. The defendant was ultimately convicted of the charged offense, and the trial court sentenced her to a five-day jail term.

On appeal, the defendant argued, *inter alia,* that the trial court's refusal to accept her no contest plea constituted an abuse of discretion. The Intermediate Court of Appeals (ICA) disagreed, taking note of the language of HRPP 11(b) and (f) and observing correctly that

> [t]he main purpose of the nolo contendere plea is to allow the court and the defendant to avoid the time and expense of trial. If the court allows the plea without requiring the defendant to present a factual basis for the plea, the defendant avoids having to admit guilt, "saves face," and is shielded from having the plea used against him or her in any civil suit based on the alleged illegal conduct.

*Medeiros,* 8 Haw.App. at 42–44, 791 P.2d at 733–34 (citations and emphasis omitted). The ICA then held that the trial court's "refusal to accept the plea without requiring a factual basis therefor is not a basis for reversal, for acceptance of a nolo plea is solely a matter of grace, something to which defendants are by no means automatically entitled." *Id.* at 45, 791 P.2d at 734 (citation, emphasis, and internal quotation marks omitted). Implicit in the holding of the *Medeiros* court was the proposition that, pursuant to HRPP 11, a trial court has the *discretion* to insist upon a "factual basis" for a no contest plea, but is not *required* to do so.

Although the validity of a no contest plea was not at issue in *State v. Morin,* 71 Haw. 159, 785 P.2d 1316 (1990), this court nevertheless provided a cogent description of the mischief that would often result, as the present matter exemplifies, from a defendant's capacity to challenge the sufficiency of the factual basis underlying a no contest plea entered as part of a plea agreement:

To allow ... [d]efendants to plead no contest in exchange for the reduction and dismissal of charges against them, and then to permit them to attack the remaining convictions achieved by those pleas, where those pleas were not conditioned upon the right to appeal, would jeopardize the integrity of the plea bargaining process.

*Id.* at 164, 785 P.2d at 1319.

We hold that, by its plain language, HRPP 11(f) applies only to guilty pleas and that, with respect to pleas of nolo contendere (*i.e.*, no contest), the trial court is not required to make "such inquiry as shall satisfy it that there is a factual basis for the plea." However, we recognize, as did the *Medeiros* court, that HRPP 11(b) accords the trial court the discretion, "after due consideration of the views of the parties," to refuse a no contest plea that it deems not to be in "the interest of the public in the effective administration of justice." Accordingly, we further hold that HRPP 11(b) likewise accords trial courts (such as, in this case, Judge Tsukiyama) the discretion to insist upon a "factual basis" (or, more accurately, an offer of proof) as a part of their deliberations regarding whether to accept a no contest plea. We emphasize, however, that the trial court's discretion in this regard derives from HRPP 11(b) and not HRPP 11(f). For that reason, it does not matter whether the parties' offer of proof as to the "factual basis" for a no contest plea would meet the standard mandated by HRPP 11(f) regarding guilty pleas. Therefore (although we believe that the prosecution's offer of proof in this case would have satisfied HRPP 11(f) had Merino tendered a *guilty* plea, *see* section I.A. of this opinion, *supra* at 13–16), we hold that it was immaterial whether the offer, which Judge Tsukiyama required in order to exercise his "wide discretion," *see Medeiros*, 8 Haw.App. at 43, 791 P.2d at 733, to accept or not to accept Merino's *no contest* plea pursuant to HRPP 11(b), was sufficient to satisfy HRPP 11(f).

3. *Merino voluntarily and intelligently waived his right to counsel in connection with the entry and acceptance of his no contest plea.*

 The sixth amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." A criminal defendant's right to counsel, being "implicit in the concept of ordered liberty," *see Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), is applicable to the states through the due process clause of the fourteenth amendment. *State v. Hutch*, 75 Haw. 307, 319 n. 3, 861 P.2d 11, 18 n. 3 (1993); *Dicks*, 57 Haw. at 47, 549 P.2d at 729; *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Analogously, article I, section 14 of the Hawai'i Constitution (1978) provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense." "The right to counsel is waivable when it is voluntarily and intelligently undertaken." *Dicks*, 57 Haw. at 48, 549 P.2d at 729 (citing *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); *see also Reponte v. State*, 57 Haw. 354, 361, 556 P.2d 577, 582 (1976).

 In this connection, and as indicated in section I.B. of this opinion, *supra*, the circuit court entered written FOF, COL, and an order denying Merino's motion to withdraw his no contest plea. In its order, the circuit court denominated all of its entries as "findings of fact/conclusions of law" (FOF/COL). An FOF " 'is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.' " *Tachibana v. State*, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995) (quoting *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994)). By contrast, a COL

is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's [FOF] and that reflects an application of the correct rule of law will not be overturned.

*Wallace*, 80 Hawai'i at 391, 910 P.2d at 704 (citations omitted).

We have also recognized that in a ... technical sense, waiver is a question that requires application of constitutional principles to the facts as found. Accomplishment of this task requires us to examine the entire record and make an independent determination of the ultimate issue ... based upon that review and the totality of the circumstances.... Thus, we apply a *de novo* standard of appellate review to the ultimate issue [of the] voluntariness[, knowledge, and intelligence of a waiver.]

*State v. Hoey*, 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (citations and internal quotation marks omitted) (some brackets and ellipsis points in original and some added) (emphases deleted).

In its order, the circuit court found and concluded, *inter alia*, that: (1) "Merino ... was fully apprised of, and clearly understood his right to be represented by effective legal counsel, appointed or retained" (FOF/COL No. 1); (2) Merino "consciously, deliberately, knowingly, and intelligently waived his right to assistance of legal counsel. He chose to represent himself and[,] in so doing, was fully aware of the pitfalls of his decision" (FOF/COL No. 2); (3) "[u]nder the ... circumstances, if the Court had compelled [Merino] to accept legal counsel or denied [Merino] the right to appear without counsel, [Merino] would have been deprived of his constitutional right pursuant to *Faretta v. California*, 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975)" (FOF/COL No. 3); [21] (4) Merino "voluntarily waived his right to be represented by legal counsel, with a full and complete understanding of the nature of this right and the consequences of his waiver thereof" (FOF/COL No. 5); and (5) "[t]hus, there is no question that [Merino] was competent to

---

21. Merino argues that "[t]he issue at hand does not center on whether counsel should be forced upon a criminal defendant." To the extent that he implies that Judge Tsukiyama was not obligated to be sensitive to Merino's persistent renunciation of his right of legal representation, Merino is mistaken.

In *Faretta v. California*, 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975), the United States Supreme Court recognized that defendants in criminal cases have a constitutional right of self-representation that is "necessarily implied by the structure of the [sixth] [a]mendment" to the United States Constitution. *Id.* at 819 [95 S.Ct. at 2533]. In so ruling, the *Faretta* Court reasoned as follows:

The [s]ixth [a]mendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." ... The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the [s]ixth [a]mendment contemplate that counsel, like the other defense tools guaranteed by the [a]mendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the [a]mendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the [a]mendment insists.

*Id.* at 819–20 [95 S.Ct. at 2533–34] (footnotes omitted).

....

Article I, section 14 of the [Hawai'i] Constitution parallels the sixth amendment's guarantee of a defendant's right to counsel in criminal cases.... *Dicks*, 57 Haw. [at] 47, 549 P.2d [at] 729.... [T]his court has always been mindful of its obligation to "afford defendants the minimum protection required by federal interpretations of the [f]ourteenth [a]mendment to the Federal Constitution...." *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967). Accordingly, inasmuch as the United States Supreme Court has deemed the right of self-representation to be implicit in the sixth amendment to the United States Constitution and the sixth amendment is applicable to the states through the fourteenth amendment, it therefore follows, and we so hold, that the same right is guaranteed by article I, section 14 of the [Hawai'i] Constitution.

*Hutch*, 75 Haw. at 318–22, 861 P.2d at 18–19 (footnotes omitted) (some brackets and ellipsis points in original and some added). However, we express no opinion regarding whether, in this case, the circuit court would have erred if it had appointed standby counsel for Merino, over his objection or otherwise. *See generally id.* at 320–23, 861 P.2d at 18–20; *see also McKaskle v. Wiggins*, 465 U.S. 168, 174, 177–79, 184, 104 S.Ct. 944, 950–51, 954, 79 L.Ed.2d 122 (1984).

proceed pro se *for purposes of the plea bargain and change of plea*" (FOF/COL No. 13) (emphasis added).

Merino challenges the aforementioned FOF/COL on appeal as being "clearly erroneous" on the ground that he was not "*made aware* of the dangers and disadvantages of self-representation, so that the record will establish that he *knows* what he is doing and his choice is made with eyes open" (quoting *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and citing *State v. Vares*, 71 Haw. 617, 801 P.2d 555 (1990)) (emphases added). Accordingly, quoting *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541, Merino urges that "there was no *knowing and intelligent* relinquishing of the 'traditional benefits associated with the right to counsel.'" (Emphasis added.) [22]

Merino, however, does not contest—and therefore, for purposes of his appeal, leaves undisturbed, *see* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(C) (1995)— the following FOF/COL: (6) "*The record amply demonstrates [Merino's] capacity to proceed pro se.* Without the benefit of legal counsel, [Merino] was capable of formulating and negotiating to successful fruition a plea bargain which achieved his intended objective. Said plea bargain worked distinctly to his benefit. [Merino] was able to conclude said agreement with a prosecutor who had a reputation for being a rather strict prosecutor" (FOF/COL No. 6); (7) "[Merino's] plan was to avoid publicity which could work to the disadvantage of his family members" (FOF/COL No. 7); (8) "[Merino] did express concerns for the members of his family. The Court does not question his concern or his sincerity in this regard" (FOF/COL No. 8); (9) "[Merino] wanted to maintain his membership on the Tribal Council" (FOF/COL No. 9); (10) "[Merino] effected a reduction in the charge from a possible ten-year prison term to a possible five-year prison term"

(FOF/COL No. 10); (11) "*[Merino] succeeded in negotiating* the aforementioned *even where seasoned[ ] legal counsel might not have succeeded under the circumstances*" (FOF/COL No. 11); and "[Merino] was even able to obtain a letter of expungement from the Department of the Attorney General" (FOF/COL No. 12). (Emphases added.)

■ For the reasons discussed below, we disagree with Merino's contention that he did not knowingly and intelligently waive his constitutional right to the assistance of counsel.

■ "To determine whether a waiver" of the "fundamental right" to "adequate legal representation" was "voluntarily and intelligently undertaken, this court will look to the totality of [the] facts and circumstances of each particular case." *Vares*, 71 Haw. at 621, 801 P.2d at 557–58 (citing *Dicks*, 57 Haw. at 48–49, 549 P.2d at 729–30); *see also Reponte*, 57 Haw. at 361–62, 556 P.2d at 583 ("'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' In other words, the 'totality of the circumstances' surrounding this problem must be considered." (Quoting *Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023, and citing *Dicks* )). "With a silent or minimal record, the burden is upon the prosecution to prove a knowing and voluntary waiver.[23] However, where it appears from the record that a defendant has waived a constitutional right, the defendant carries the burden of proof to show otherwise by a preponderance of the evidence." *State v. Ibuos*, 75 Haw. 118, 121, 857 P.2d 576, 578 (1993) (citations omitted).

The record in the matter before us is far from "silent or minimal" on the subject of

---

22. Significantly, Merino does not suggest that his waiver of the right to counsel was *involuntary*.

23. *Cf. State v. Vaitogi*, 59 Haw. 592, 597, 585 P.2d 1259, 1262 (1978), in which this court quoted *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969), for the proposition that, with respect to the sixth amend-

ment right to counsel, "'[p]resuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver.'"

whether Merino was "made aware of the dangers and disadvantages of self-representation." As noted in section I.A. of this opinion, *supra*, on August 25, 1988, Judge Tsukiyama elicited Merino's acknowledgment that Judge Heely had previously apprised Merino of his right to retained or court-appointed counsel and that Merino had declined counsel and opted to proceed *pro se*; in the course of the same hearing, Judge Tsukiyama reminded Merino of his ongoing right to counsel at least twice and elaborated at length upon the reasons why "not having a lawyer ... could be very detrimental to [his] cause." Moreover, at the outset of the August 29, 1988 hearing, Judge Tsukiyama reminded Merino twice again that he continued to be entitled to seek and obtain legal counsel at any time; in response to Judge Tsukiyama's queries, Merino repeatedly represented that he did not want to consult with an attorney regarding the new complaint or any defenses to it and that he was satisfied that he was competent to represent himself and wished to proceed *pro se* with respect to the implementation of the plea agreement that he had successfully negotiated with the prosecution.

Nevertheless, citing *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), and *Vares*, 71 Haw. at 621–22, 801 P.2d at 558, Merino asserts that his waiver of counsel was not knowingly and intelligently undertaken because he was not made aware of "the nature of the charges [against him], ... possible defenses [thereto,] and the circumstances in mitigation" thereof. (Ellipsis points in original.)[24] In this connection, we note that the *Vares* court cited *Dicks* as an example of voluntary and intelligent waivers of counsel. *Vares*, 71 Haw. at 622, 801 P.2d at 558. The colloquy between the trial court and the defendants quoted in *Dicks* reflects that the court instructed the defendants regarding neither the particulars of "possible defenses" to the charge nor potential "circumstances in mitigation." *See Dicks*, 57 Haw. at 50–51, 549 P.2d at 731. Even so, the *Dicks* court held that "the trial judge did not err in determining that the defendants un-

derstood the charge against them at the time they entered their guilty pleas." *Id.* at 54, 549 P.2d at 733.

Although it is possible that there may be circumstances in which the trial court might be obligated to administer a criminal procedure course to a defendant on the substantive intricacies of all conceivable defenses to a charge and all conceivable "circumstances in mitigation" thereof for the purpose of ensuring that a knowing and intelligent waiver of counsel has preceded a change of plea, we are satisfied—in light of (1) Merino's persistent refusal of legal assistance despite Judge Tsukiyama's repeated invitations to avail himself of it, *see* section I.A. of this opinion, *supra*, (2) Judge Tsukiyama's scrupulous adherence to the mandates of HRPP 11, *see id.* and section III.A.2. of this opinion, *supra*, which, on its face contemplates that *pro se* defendants may enter guilty and no contest pleas pursuant to plea agreements, *see* HRPP 11(e)(1), and (3) the facts that (a) the new complaint adequately charged the offense of criminal conspiracy to commit theft in the first degree, *see* sections I.A. and III.A.1. of this opinion, *supra*, (b) HRPP 11 did not require the prosecution to provide a factual basis for Merino's no contest plea, *see* section III.A.2., *supra*, and (c) Merino amply demonstrated his capacity to proceed *pro se* by "formulating and negotiating to successful fruition a plea bargain[,] which achieved his intended objective" even where "seasoned[ ] legal counsel might not have succeeded" and "which worked distinctly to his benefit," *see* FOF/COL Nos. 6 and 11, *supra*—that the matter before us does not present such a case.

We hold, on the record before us, that Merino has failed to carry his burden of proving by a preponderance of the evidence that he did not knowingly, intelligently, and voluntarily waive his right to counsel through and including the entry of his no contest plea. Accordingly, looking to the totality of the facts and circumstances of the particular case, we hold that Merino's waiver of his right to the assistance of counsel was know-

---

24. We reemphasize that Merino is not claiming that his waiver of counsel was not *voluntarily*

undertaken. *See supra* note 22.

ingly, intelligently, and voluntarily undertaken.

#### 4. *Summary*

For the foregoing reasons, we hold that the circuit court did not commit an abuse of discretion when it accepted Merino's no contest plea to the new complaint.

B. *The Circuit Court Did Not Commit An Abuse Of Discretion In Denying Merino's Motion To Withdraw His No Contest Plea.*

Merino filed his motion to withdraw his no contest plea on July 12, 1989 (ten-and-one-half months after Judge Tsukiyama accepted his tendered no contest plea), pursuant to HRPP 32(d) (1995),[25] which provides:

> **Withdrawal of Plea of Guilty.** A motion to withdraw a plea of *guilty or of nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence shall set aside the judgment of conviction and permit the defendant to withdraw his plea.

(Emphasis added.)

■■■ In *Jim, supra,* which we recently described as "the leading case in this jurisdiction regarding withdrawal of a defendant's guilty or no contest plea," *see Gomes,* 79 Hawai'i at 36, 897 P.2d at 963, this court offered the following structural overview [hereinafter, "the *Jim* overview"] of Hawai'i Rules of Criminal Procedure Rule 32(d), which was the predecessor of—and identical to—HRPP 32(d):

> A defendant does not have an absolute right to withdraw his [or her] guilty plea, and a motion for withdrawal of a guilty plea under the . . . rule must therefore be determined under either of two established principles. Where the request is made after sentence has been imposed, the "manifest injustice" standard is to be applied. But where the motion is presented to the trial court before the imposition of sentence, a more liberal approach is to be taken, and the motion should be granted if the defendant has presented a fair and just reason for his request and the [prosecution] has not relied upon the guilty plea to its substantial prejudice.

*Jim,* 58 Haw. at 575–76, 574 P.2d at 522–23 (citations and footnote omitted); *see also Adams,* 76 Hawai'i at 411, 879 P.2d at 516; *Smith,* 61 Haw. at 523, 606 P.2d at 88. Notwithstanding that actual "guilt or innocence is not the issue on a motion to withdraw a guilty [or no contest] plea," *Jim,* 58 Haw. at 576, 574 P.2d at 523, "the trial court may hold an evidentiary hearing to determine the plausibility and legitimacy of a defendant's reasons for requesting withdrawal of his or her plea," *Gomes,* 79 Hawai'i at 36, 897 P.2d at 963 (citing *Jim,* 58 Haw. at 579, 574 P.2d at 524), and "[t]he defendant has the burden of establishing plausible and legitimate grounds for the withdrawal." *Costa,* 64 Haw. at 565, 644 P.2d at 1331.

■■ Because Merino filed his HRPP 32(d) motion in the present case before the circuit court imposed sentence, pursuant to the *Jim* overview and the two-pronged "liberal approach," we review for abuse of discretion, *see* section II. of this opinion, *supra,* Judge Tsukiyama's denial of the motion and inquire (1) whether Merino presented "fair and just reasons" for his request, and, if and only if he has, (2) whether the prosecution relied upon the no contest plea to its substantial detriment.[26] The second prong of the "liberal approach" is conditioned upon satisfaction of the first because "the absence of substantial prejudice [does] not support or resurrect a defendant's pre-sentence motion to withdraw a guilty or no contest plea where no fair and just reason for withdrawal has been presented." *Gomes,* 79 Hawai'i at 40, 897 P.2d at 967.

In the context of our review, we note that the three-day evidentiary hearing on Merino's HRPP 32(d) motion—spanning almost four-and-one-half months—facilitated "the examination of two fundamental bases [here-

---

25. HRPP 32(d) has never been amended from its original form, which became effective, along with the rest of the HRPP, on January 1, 1977.

26. In the matter before us, the prosecution does not claim that it relied on Merino's no contest plea to its substantial prejudice.

inafter, 'the *Gomes* bases'] for demonstrating 'fair and just reasons' for granting withdrawal of [Merino's] plea: (1) [Merino] did not knowingly, intelligently or voluntarily waive his ... rights; or (2) changed circumstances or new information justif[ied] withdrawal of [his] plea." *Id.* at 37, 897 P.2d at 964.

◼ Where the second of the *Gomes* bases—changed circumstances or new information justifying withdrawal of a no contest plea—is the ground for an HRPP 32(d) motion to withdraw a no contest plea, the rule [hereinafter, "the *Gomes* rule"] is that

a defendant is entitled to withdraw his or her nolo contendere plea before imposition of sentence where: (1) the defendant has never expressly admitted guilt; (2) the defendant advances a claim of new information or changed circumstances with factual support that, if believed by a reasonable juror, would exculpate the defendant; (3) there has been no undue delay in moving to withdraw the plea; and (4) the prosecution has not otherwise met its burden of establishing that it relied on the plea to its substantial prejudice.

*Id.* at 39, 897 P.2d at 966 (emphasis omitted).[27]

The present appeal accords this court its first opportunity, in the wake of *Gomes,* to flesh out a comprehensive rule for reviewing the denial of a defendant's HRPP 32(d) motion to withdraw a no contest plea grounded in the first of the *Gomes* bases, namely, that the defendant, at the time the plea was entered, did not knowingly, intelligently, or voluntarily waive his or her rights. We have, however, ruled in the past that

if the accused, with full knowledge of the charge against him [or her] and of his [or

her] rights and the consequences of a plea of guilty [or no contest], enters such a plea understandingly and voluntarily, the court may, without abusing its discretion, refuse to permit [the defendant] to withdraw the plea.

*Dicks,* 57 Haw. at 49–50, 549 P.2d at 730.

◼ Accordingly, harmonizing *Dicks* with the logic of *Gomes,* we now hold that a defendant is entitled to withdraw his or her no contest plea before imposition of sentence, premised upon the first of the *Gomes* bases, where: (1) the defendant has not entered the plea knowingly, intelligently, and voluntarily; (2) there has been no undue delay in moving to withdraw the plea; *and* (3) the prosecution has not otherwise met its burden of establishing that it relied on the plea to its substantial prejudice. Absent any of these factors, the trial court may, without abusing its discretion, refuse to permit the defendant to withdraw the plea.

◼ On appeal, Merino advances four grounds in support of his claim that the circuit court committed an abuse of discretion in denying his HRPP 32(d) motion to withdraw his no contest plea: (1) his capacity to exercise sound judgment was allegedly impaired at the time he entered his plea; (2) his no contest plea constituted an implicit assertion of innocence, to which he consistently adhered thereafter; (3) he was deprived of the assistance of counsel at the time he entered his plea; and (4) the prosecution would have suffered no substantial prejudice had his motion been granted. In accordance with the rule set forth in the preceding paragraph, the second ground is immaterial, although we note that a no contest plea is *not,* without more, an assertion of

---

**27.** In *Gomes,* the defendant did not challenge the voluntariness of his no contest plea. Consequently, we deemed the prosecution's assertion that the plea was voluntarily and knowingly entered to be irrelevant. Rather, we construed the inquiry to be whether the defendant had "otherwise presented a 'fair and just reason' for withdrawing the plea." *Gomes,* 79 Hawai'i at 36 n. 8, 897 P.2d at 963 n. 8. Had the knowing, intelligent, or voluntary character of the defendant's no contest plea (*i.e.,* the first of the *Gomes* bases) been the unadorned basis for the challenge, then the first criterion of the *Gomes* rule—

no express admission of guilt—could not have been interposed as a necessary precondition to withdrawal of the plea. *See* HRPP 11; *Vaitogi,* 59 Haw. at 597–98, 585 P.2d at 1262–63; *Dicks,* 57 Haw. at 49–50, 549 P.2d at 730; *Boykin,* 395 U.S. at 242–43, 89 S.Ct. at 1711–12. Moreover, the second criterion of the *Gomes* rule—the advancement of factual support for new information or changed circumstances that, if believed by a reasonable trier of fact, would exculpate the defendant—would have had no direct bearing on our HRPP 32(d) analysis.

innocence, express or implied. *See* section III.A.2. of this opinion, *supra.* Moreover, our holding in section III.A.3. of this opinion, *supra,* that Merino knowingly, intelligently, and voluntarily waived his right to the assistance of counsel effectively disposes of the third ground. Finally, we need reach the fourth ground only if Merino carries his burden with respect to the first. *Gomes,* 79 Hawai'i at 40, 897 P.2d at 967.[28] We therefore address the first ground.

■■■ As we have indicated, Merino asserts that, at the time he entered his no contest plea, his ability to exercise sound judgment was impaired. In other words, he claims that his plea was not knowing and voluntary, thus constituting a fair and just reason for withdrawing the plea. *See Jim,* 58 Haw. at 576–77, 574 P.2d at 522–23. We review Merino's claim *de novo, i.e.,* according to the right/wrong standard, based upon an examination of the entire record. *Hoey,* 77 Hawai'i at 32, 881 P.2d at 519.

■■■ Merino first contends that his capacity to exercise sound judgment was impaired at the time he entered his plea because he was taking an assortment of medications that rendered him nervous, tired, and weak.[29] Merino further argues that, on the day he entered his plea, he had forgotten to take his insulin injection for his diabetes, which resulted in his experiencing "insulin shock." Richard A. Jorgensen, M.D., who had been treating Merino for medical and psychiatric purposes for approximately one month prior to the hearings on Merino's HRPP 32(d) motion, testified, to a reasonable degree of medical certainty, that a diabetic, taking the medications that Merino was prescribed and failing to take his insulin, would be adversely affected in his ability to reason and exercise sound judgment while under emotional stress. Moreover, the parties stipulated that

Merino suffered from a serious heart condition. Dr. Jorgensen testified that Merino's heart condition could have exacerbated a state of confusion at the time.

Second, Merino claims that his capacity to exercise sound judgment was impaired when he entered his no contest plea because of the potential negative consequences that a trial might have inflicted on his family. He testified that, at the time he entered his plea, his wife, three daughters, and a son were incarcerated. He further testified that he had believed that, if he could avoid trial publicity, the paroling authority might consider early release for his family members. Thus, he testified that "one of the main reasons" that he pled no contest was to avoid publicity that would reflect adversely on his imprisoned family members.

Notwithstanding the foregoing, the record contains substantial and credible evidence that would justify a reasonable person in concluding that Merino's plea was knowing and voluntary.

First, as the record of his change of plea proceedings reflects, *see* section I.A. of this opinion, *supra,* Merino represented to Judge Tsukiyama that (1) he had consumed no pills, medication, or alcohol within the prior forty-eight hours, (2) his mind was clear, (3) he understood the charge against him, (4) he understood the rights that he was waiving by entering his no contest plea, (5) he was entering the plea of his own free will, and (6) he was not being "forced, threatened, or pressured by anyone or anything" to enter the plea. Moreover, prior to the commencement of his colloquy with Judge Tsukiyama, he was directed to ask Judge Tsukiyama to repeat or explain any question that he did not understand. Finally, at the conclusion of the proceedings, Merino clearly stated that

---

28. *See supra* note 26.

29. Merino's medical records reflect that, during the period surrounding the entry of his plea, he was prescribed or otherwise in possession of Lasix, K-lor, Endurol, Halcion, and Xanax for a heart condition. Richard A. Jorgensen, M.D., a licensed psychiatrist, testified that: Lasix is a diuretic designed to rid the body of excess fluid; K-lor is a potassium supplement; Endurol regu-

lates blood pressure and heart rate; Halcion is a sleeping medication; and Xanax is an anti-anxiety and anti-depressant medication. Dr. Jorgensen also testified that these medications carried potential side effects. For example, Endurol could cause disorientation and memory lapse, and Halcion could cause drowsiness, dizziness, confusion, abnormal behavior, and amnesic episodes.

■■■■■■

**226**

he understood everything that had transpired and that he had no questions. *See id.*

Second, during the hearings on Merino's HRPP 32(d) motion to withdraw his plea, a former deputy prosecutor testified that she had been present at Merino's change of plea proceeding and that, from a lay perspective, Merino appeared to be calm and rational. She further testified that Merino answered Judge Tsukiyama's questions appropriately and that Merino "appeared to . . . know what he was doing and to know where he was."

Third, Dr. Jorgensen testified that he did not know whether Merino's representations that he had taken the aforementioned medications on the day he entered his no contest plea were true. Dr. Jorgensen also testified that, even if Merino had taken all of the indicated medications but had neglected to have his insulin injection, Merino would not necessarily have suffered any adverse side effects at all.

On the basis of our examination of the entire record, including the foregoing, we are independently satisfied that Merino entered his no contest plea knowingly, intelligently, and voluntarily. Accordingly, in the absence of a fair and just reason for withdrawal of Merino's no contest plea, we hold that the circuit court did not commit an abuse of discretion in denying Merino's HRPP 32(d) motion.

## IV. CONCLUSION

For the reasons set forth above, Merino's judgment of conviction is affirmed.