95 P.3d 14

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Lance BARROS, Defendant–Appellant.**

**No. 25032.**

Intermediate Court of Appeals of Hawai'i.

July 2, 2004.

Certiorari Denied Aug. 9, 2004.

162

Carrie Ann Y. Shirota, Deputy Public Defender, State of Hawaiʻi, on the briefs, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Lance Barros (Barros or Defendant) appeals the March 8, 2002 judgment of the district court of the first circuit [1] that convicted him of (1) violation of a temporary restraining order (TRO) against harassment issued pursuant to Hawai'i Revised Statutes (HRS) § 604–10.5 (Supp.2003); [2] and (2) criminal contempt of court, in violation of HRS §§ 710–1077(1)(g) and 710–1077(3)(b) (1993). [3]

Barros contends:

1. The trial court committed reversible error in failing to obtain a valid waiver from Lance Barros of his fundamental right to trial by jury.

. . . .

2. The trial court erred in failing to set forth the particular circumstances of Lance Barros' conviction for contempt of court in the judgment and in the order or warrant of commitment, as required by HRS § 710–1077(5).

. . . .

3. The trial court erred in convicting Lance Barros because there was insufficient evidence that he violated the restraining order.

. . . .

4. The trial court erred in convicting Lance Barros of criminal contempt of court because there was insufficient evidence that he knowingly disobeyed the injunction of the court that issued the TRO.

1. The Honorable James H. Dannenberg, judge presiding.

2. Hawai'i Revised Statutes (HRS) § 604–10.5(h) (Supp.2003) provides in pertinent part that, "A knowing or intentional violation of a restraining order or injunction issued pursuant to this section is a misdemeanor."

3. HRS § 710–1077(1)(g) (1993) provides that, "A person commits the offense of criminal contempt of court if:. . . . The person knowingly disobeys or resists the process, injunction, or other mandate of a court[.]" (Enumeration omitted; format modified.) HRS § 710–1077(3)(b) (1993) provides that:

Opening Brief at 8–14. We agree with point 2, but not the others. Accordingly, we affirm in part and vacate in part.

## I. Background.

On July 12, 2001, Barros was orally charged with violating a restraining order against harassment issued pursuant to HRS § 604–10.5. The district court referred Barros to the public defender. The district court record of this proceeding notes: "To determine waive or demand jury trial[.]" The oral charge arose out of a July 2, 2001 incident in which Barros' brother, Wyman Barros (Wyman), went to the apartment of the complainant, Tricia Soares (Soares), and confronted her despite the TRO Soares had obtained against Barros earlier that day. The TRO prohibited Barros and "any other person[s] acting on [his] behalf" from contacting, threatening, or physically harassing Soares or anyone residing at her home. The TRO similarly prohibited telephone contact with Soares and any entry or visitation of her residence, including yard and garage.

On July 18, 2001, a penal summons complaint issued against Barros, charging him with criminal contempt of court. According to the district court record, Barros was charged with petty misdemeanor contempt, a "violation of [HRS] section 710–1077(1)(G)(3) [sic]." The written charge arose out of a July 6, 2001 telephone call Barros made to Soares.

On August 14, 2001, Barros again appeared *pro se* in the district court. The district court record of this proceeding reflects: "Re-refer to public defender for waiver or demand jury trial." At the continued

The court may treat the commission of an offense under subsection (1) as a petty misdemeanor, in which case:. . . . If the offense was not committed in the immediate view and presence of the court, nor under such circumstances that the court has knowledge of all of the facts constituting the offense, the court shall order the defendant to appear before it to answer a charge of criminal contempt of court; the trial, if any, upon the charge shall be by the court without a jury; and proof of guilt beyond a reasonable doubt shall be required for conviction.

(Enumeration omitted; format modified.).

arraignment and plea held on August 31, 2001, the following transpired:

[DEPUTY PROSECUTING ATTORNEY (DPA)]: Case C7 and 8, Lance Barros?

THE DEFENDANT: Yeah.

THE COURT: Let's take Mr. Barros. What's your name, sir?

THE DEFENDANT: Lance Barros.

THE COURT: Good morning, Mr. Barros. Looks like we sent you to the Public Defender's a couple of times. Did you go?

THE DEFENDANT: I called too late. They said—so, I gotta call today after court.

THE COURT: Mr. Barros, you have the right to a jury trial in these matters.

THE DEFENDANT: I don't want one.

THE COURT: Huh?

THE DEFENDANT: I don't want one.

THE COURT: Alright. Were you listening when I described earlier what a jury trial is?

THE DEFENDANT: Yes.

THE COURT: Do you know what a jury trial is?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. You're willing to give that right up?

THE DEFENDANT: Yes, I am.

THE COURT: Alright, Mr. Barros, I'll find the waiver of jury trial. At this point, what I'll do is, I think you should talk it over with a public defender. I'll refer you one more time for the Public Defender. We'll set it for trial. Be sure you don't miss out on them cause if it comes up for trial and you haven't gone, you might not get a continuance, okay?

THE DEFENDANT: Right, thank you.

THE COURT: Alright, thank you.

Barros appeared with counsel on September 28, 2001, and trial was continued. After several more continuances, the case came on for trial on January 18, 2002.

Just before the bench trial started, the district court took care of several matters:

[DPA]: Yes, your Honor, I'd like to call Cases 4 and 5 on the criminal trial calendar, Lance Barros.

[DEPUTY PUBLIC DEFENDER (DPD)]: Good afternoon, Judge Dannenbeg, on behalf of Mr. Barros, .... Your Honor, can we waive reading of the charges and just enter a plea of guilty [sic].

THE COURT: I don't know. He was orally charged it looks like on July 12th, so let me see, penal summons complaint served, so I assume that you can now, but give me a thumbnail sketch. The contempt, number 5 is, contempt for what?

[DPA]: Number 5. Oh, that's the telephone call. Violation of the TRO, and 4 is also a violation of the same TRO.

THE COURT: But under different statutes?

[DPA]: Different circumstances.

THE COURT: Okay, alright, but different statutes?

[DPA]: Yes, your Honor.

THE COURT: Alright. And they are both misdemeanors [sic], and I assume there's been a waiver of jury trial. I'll assume it, I don't—double check it.

[DPD]: Yes, your Honor. There was a waiver on C4 on 8–31.

THE COURT: Yeah, waived.

[DPD]: C4, I mean, 8–31 there were waivers, your Honor.

THE COURT: Okay, I see, okay.

[DPD]: Thank you.

THE COURT: And your pleas to these two charges?

[DPD]: Not guilty, your Honor on both.

THE COURT: Okay, have a seat.

[DPA]: And your Honor, I believe there's a stipulation that Mr. Barros was served with the TRO on July 2nd, year 2001, at 1700 hours.

[DPD]: That's correct, your Honor. Your Honor, there is such a stipulation between the parties.

THE COURT: That's okay with you, Mr. Barros[,] they don't have to prove that they served you.

THE DEFENDANT: Yeah, they served me.

THE COURT: Okay, I'll find the stipulation in order and okay, you may call your first witness.

Soares was the State's only witness. She remembered that on July 2, 2001, she was living in a two-story apartment building. Soares had gotten the TRO against Barros that day because, she claimed, he had "keyed my car, put paint remover on my car." At about 6:00 p.m., she saw Barros standing at the front door to her neighbor's apartment, some fifty feet away and "across the hall." The neighbor was Perry Barros (Perry), who had been married to another brother of Barros. Soares recalled, "I looked out the window and I seen him, and he walked in the house and then my neighbor called and told me to call the police, so I called the police." The following exchange ensued:

[DPA]: Q [N]ow, after you looked out the window, you called the police, correct?

A Yes.

Q What happened after that?

A I was waiting for the police and just so happened, I looked at the front door, and his brother appeared right at the front door.

Q Who's his brother?

A Wyman (spelled phonetically) Barros. So, my dad walked up behind me and said who are you, and he said why, why does it matter to you, and he just had an aggressive tone of voice telling me to—

[DPD]: Your Honor, objection, hearsay.

THE COURT: Not necessarily. We're talking about possible verbal acts here, and that's possibly admissible, so overruled at this point. What did the brother say, what's the brother's name?

THE WITNESS: Wyman Barros.

THE COURT: And what did he say?

THE WITNESS: My dad asked him who he was and he just said why does it matter to you, I'm here to see her, and he told me my brother didn't key your car, and give back keys to their house, which I didn't have, and he told me to, why did I put a restraining order on him cause he didn't do anything to me. That's when I

seen him turn to, he turned to his left and he must have seen the police officer cause he just turned around and walked away.

[DPA]: Q Okay, at anytime, did Wyman—what did you say his brother's name was?

A Wyman.

Q Wyman. Did he tell you that Mr. Lance Barros sent him to get the keys?

A To get the keys, yes.

Q So, he specifically said that Lance told me to come get his, my keys?

A Yeah, get his keys, you have his keys to his room. And I said why would I have that.

Q Okay. Now, what happened after that?

A He just kept talking to me about bringing a restraining on him and about keying my car. He wasn't there for very long cause the police officer came right behind him and he left.

Q Okay. And did you see the defendant at any other time?

A No, I was making my police report.

Soares also testified that on July 6, 2001, at about midnight, she received a call on her cell phone. She noticed the number calling, 261–9595, which was the number of the Enchanted Lakes Elementary School pay phone. Barros usually used that pay phone to telephone her. "I heard Lance's voice say you fucking slut, and I said hello and then he just hung up."

On cross-examination, Soares acknowledged that, while her written statement to the police indicated the call was made at 12:11 a.m., her cell phone billing records showed no call at that exact time. Soares denied taking any personal items, such as money or keys, from Barros. On redirect examination, Soares explained that the clock she used to gauge the time of the call is usually set five minutes fast. Soares noted a 12:07 a.m. call in her cell phone records.

Barros testified in his own defense. He first explained, "how this all started." On July 1, 2001, Soares stayed overnight at his house. She had to leave before he was to wake up, so he gave her a key to deadbolt

the door when she left. Barros came home from work at about 4:30 or 5:00 p.m. the next day and discovered some money was missing from his room. He immediately suspected Soares, because there was no sign of forced entry and she was the only other person with a key to his room. When he contacted the police, "they came with a TRO. They didn't care about my robbery report." Barros went down to the police station to be served with the TRO. While he was there, Perry arrived and told him she would get his key back. She instructed him to meet her at her apartment, which he did.

Barros noted that Soares could not have seen him from her apartment window. He maintained that Soares could have seen him in front of Perry's apartment only from a vantage point outside of her apartment. Barros estimated the distance between the two apartments at "way over a hundred feet."

Continuing, Barros remembered that when he walked into Perry's apartment, he asked her if she had gotten his key back. Perry explained that she had not yet talked to Soares. Barros sat down, somewhat disturbed. After about ten minutes, he had to leave because his brother Wyman warned him that the police were coming. At this point in his testimony, Barros added that Wyman had accompanied him into Perry's apartment. "Somehow he vanished, I didn't know. When he came back, that's how I knew, he said the cops are coming. So I stood there, I didn't do nothing wrong." Barros emphatically denied telling Wyman to retrieve his key for him. Barros explained that Wyman "went on his own .... The key is to his house too."

As for the July 6, 2001 telephone call, Barros responded as follows to a question from the district court: "No, I didn't talk to her after I got the restraining order, your Honor. I didn't talk to her, I don't wanna deal with her, the chick is evil, okay. Something is wrong with that broad." The district court accepted this bit of testimony, thus: "Well, let's leave it to, no, I didn't make that phone call." Barros added that Wyman had a house phone at the time. Presumably, there was thus no need to use a pay phone.

On cross-examination, Barros admitted he had called Soares in the past from the pay phone. When asked to characterize the frequency of such contacts, Barros responded, "Very little." Barros denied he was angry at Soares for getting the TRO against him, but acknowledged he was angry at her for taking his money. "But I'm not angry now, whatevers."

Dawn Wong (Wong)—"a good friend of Mr. Barros"—was the other witness for the defense. She maintained that Perry's apartment cannot be seen from inside Soares' apartment. In order to get that view, one would have to walk out of Soares' apartment to the stairwell. She estimated the distance between the two second-floor apartments at one hundred fifty or two hundred feet. On cross-examination, Wong confirmed that, although she had been to the apartment building, she had never been to or inside Soares' apartment.

Briefly in closing, the DPA argued that Barros had "violated the TRO indirectly on 7-2-01 by sending his brother over to the apartment to get his keys." The DPA maintained the evidence was equally clear that Barros telephoned Soares on July 6, 2001, another violation of the TRO.

In his closing argument, the DPD attacked Soares' credibility. He pointed out that it would have been impossible for Soares to see Barros from her window. As for the July 6, 2001 telephone call, the DPD cited the discrepancy between the time of the call Soares reported in her statement to the police, and the time stated in her cell phone records. He described as "very convenient" Soares' testimony about her habit of setting her clock five minutes ahead.

The district court ruled:

Well, there's some inconsistencies, but Mr. Barros, I'm gonna tell you I believe most of what Ms. Soares told me. I believe your brother came and visited her and I believe that it was on your behalf, that was a violation of the order, and I believe you called her on the 6th. So, I am going to find you guilty.

The district court sent out for a pre-sentence investigation and report, and set sentencing

for March 8, 2002. The district court sentenced Barros to one year of probation upon terms and conditions, including two days in jail, concurrent, stayed pending appeal. Barros gave his timely notice of this appeal on April 4, 2002.

## II. Discussion.

### A. Jury Trial Waiver.

▮ Barros first contends the district court failed to obtain a valid waiver of his right to a jury trial under the Sixth Amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution.[4]

▮ Barros argues at the outset that this error vitiates both his convictions, because both offenses are misdemeanors, punishable by up to one year in prison. *See* HRS § 706–663 (1993) (in pertinent part, "the court may sentence a person who has been convicted of a misdemeanor or a petty misdemeanor to imprisonment for a definite term to be fixed by the court and not to exceed one year in the case of a misdemeanor or thirty days in the case of a petty misdemeanor"); *State v. Friedman*, 93 Hawai'i 63, 68, 996 P.2d 268, 273 (2000) ("the statutory right to a twelve-person jury trial arises whenever a defendant may be subjected to imprisonment for six months or more" (citing HRS § 806–60 (1993))).

▮ Because a violation of a TRO against harassment issued pursuant to HRS § 604–10.5 is indeed a misdemeanor, HRS § 604–10.5(h), which carries a possible year in jail, HRS § 706–663, Barros had the right to a jury trial on that offense. *Friedman*, 93 Hawai'i at 69, 996 P.2d at 274. However, as the State points out and as detailed above,

Barros was charged with criminal contempt of court as a petty misdemeanor under HRS §§ 710–1077(1)(g) and 710–1077(3)(b), which carries a maximum thirty days in jail, HRS § 706–663, and is statutorily consigned to a trial sans jury. HRS § 710–1077(3)(b). Barros had no right to a jury trial for that offense. *Friedman*, 93 Hawai'i at 68–69, 996 P.2d at 273–74. Hence, this point of error cannot affect the contempt conviction.[5]

▮ Returning to the point of error itself, we first review the general principles governing the validity of a criminal defendant's jury waiver, as outlined by the supreme court in *Friedman*:

> Hawai'i Rules of Penal Procedure (HRPP) Rule 5(b)(1) (1996) requires that, in appropriate cases, the district court shall "inform the defendant of the right to jury trial in circuit court[.]" " 'Appropriate cases' arise whenever the accused has a constitutional right to a jury trial." *State v. Ibuos*, 75 Haw. 118, 120, 857 P.2d 576, 577 (1993) (citations omitted); *see also* article I, section 14, of the Hawai'i Constitution (1978); sixth amendment to the United States Constitution. In the criminal context, the statutory right to a twelve-person jury trial arises whenever a defendant may be subjected to imprisonment for six months or more. HRS § 806–60 (1993) ("Any defendant charged with a serious crime shall have the right to trial by a jury of twelve members. 'Serious crime' means any crime for which the defendant may be imprisoned for six months or more."); *see Ibuos*, 75 Haw. at 120, 857 P.2d at 577. A defendant may, orally or in writing, voluntarily waive his or her right to trial by jury. *Id.* at 121, 857 P.2d at 578 (citing HRPP Rule 5(b)(3) ("In appropriate cases,

---

4. "The validity of a criminal defendant's waiver of his or her right to a jury trial presents a question of state and federal constitutional law. . . . We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Friedman*, 93 Hawai'i 63, 67, 996 P.2d 268, 272 (2000) (citation and internal quotation marks omitted).

5. The district court was apparently under the same misapprehension, for it sentenced Lance

Barros to one year of probation for both offenses. *See* HRS § 706–623(1)(d) (Supp.2003) ("When the court has sentenced a defendant to be placed on probation, the period of probation shall be as follows, unless the court enters the reason therefor on the record and sentences the defendant to a shorter period of probation: . . . . Six months upon conviction of a petty misdemeanor." (Enumeration omitted; format modified.)). Thus we must, *sua sponte* and in any event on appeal, vacate the sentence for criminal contempt of court and remand for re-sentencing.

the defendant shall be tried by jury in the circuit court unless the defendant waives in writing or orally in open court his right to trial by jury.")). For a valid waiver of the right to a jury trial, the trial court has a duty to inform the accused of that constitutional right. *Ibuos*, 75 Haw. at 120, 857 P.2d at 577 (citing *State v. Swain*, 61 Haw. 173, 176, 599 P.2d 282, 284 (1979)). The colloquy in open court informing a defendant of his right to a jury trial at arraignment serves several purposes: "(1) it more effectively insures voluntary, knowing and intelligent waivers ...; (2) it promotes judicial economy by avoiding challenges to the validity of waivers on appeal ...; and (3) it emphasizes to the defendant the seriousness of the decision[.]" *United States v. Cochran*, 770 F.2d 850, 851–52 (9th Cir. 1985). (citations omitted); *see also State v. Young*, 73 Haw. 217, 221–22, 830 P.2d 512, 514 (1992) (citing *Cochran* for the proposition that the preferred method of obtaining a valid written or oral waiver from the defendant occurs at arraignment). The failure to obtain a valid waiver of this fundamental right constitutes reversible error. *Ibuos*, 75 Haw. at 120, 857 P.2d at 577.

A waiver is the knowing, intelligent, and voluntary relinquishment of a known right. *See Reponte v. State*, 57 Haw. 354, 361, 556 P.2d 577, 583 (1976) (citation omitted). Thus, "[t]o determine whether a waiver was voluntarily and intelligently undertaken, this court will look to the totality of facts and circumstances of each particular case." *State v. Vares*, 71 Haw. 617, 621, 801 P.2d 555, 557–58 (1990) (citing *State v. Dicks*, 57 Haw. 46, 49, 549 P.2d 727, 730 (1976)) (noting that waiver of the right to counsel is reviewed under the totality of the circumstances); *see also State v. Merino*, 81 Hawai'i 198, 221, 915 P.2d 672, 695 (1996). Where it appears from the record that a defendant has voluntarily waived a constitutional right to a jury trial, the defendant carries the burden of demonstrating by a preponderance of the evidence that his/her waiver was involuntary. *See Ibuos*, 75 Haw. at 121, 857 P.2d at 578.

*Friedman*, 93 Hawai'i at 68–69, 996 P.2d at 273–74 (brackets and ellipses in the original).

We first observe that here, as in *Friedman:* "The record reflects that, in open court, [Barros] orally waived his right to trial by jury during a colloquy with the trial court. Thus, [Barros] bears the burden of demonstrating by a preponderance of the evidence that his oral waiver was involuntarily given." *Friedman*, 93 Hawai'i at 69, 996 P.2d at 274 (citation omitted).

Barros attempts to shoulder his burden by faulting the district court for failing "to personally inform Lance Barros what that right entailed by engaging in the four-part colloquy advised by Hawai'i's appellate courts." Opening Brief at 18. Barros refers to the tetradic colloquy Friedman urged upon the supreme court as mandatory:

> The Ninth Circuit noted that, to ensure a voluntary waiver, the district court should have directly informed the defendant that "(1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." [*United States v. Duarte–Higareda*, 113 F.3d 1000, 1002 (9th Cir.1997)] (citing *Cochran*, 770 F.2d at 853).

*Friedman*, 93 Hawai'i at 69, 996 P.2d at 274. Barros derides the colloquy in our case as "a far cry from the simple four-part colloquy envisioned by the Hawai'i Appellate courts to aid in ensuring that Mr. Barros knowingly and intelligently waived his constitutional right to a jury trial." Reply Brief at 3. Be that as it may, the *Friedman* court rejected Friedman's contention that his jury waiver could not be voluntary or knowing unless the trial court first engaged him in the *Duarte–Higareda* colloquy:

> As previously noted, however, *Duarte–Higareda* does not stand for the proposition that its suggested colloquy is required in every case. *Duarte–Higareda*, 113 F.3d at 1003 (citing *Cochran*, 770 F.2d at 853). Although we are mindful of a criminal defendant's fundamental right to a jury trial and advise the trial court to engage in such a colloquy to aid in ensuring voluntary waivers, we decline to adopt Fried-

man's contention that the *Duarte-Higareda* colloquy is constitutionally required in every case.

*Friedman,* 93 Hawai'i at 69, 996 P.2d at 274. This court has echoed the supreme court's refusal to adopt the *Duarte-Higareda* colloquy as a bright-line requirement, the absence of which—or any part of which—would *ipso facto* render a criminal defendant's jury waiver unknowing and involuntary. *State v. Valdez,* 98 Hawai'i 77, 79, 42 P.3d 654, 656 (App.2002) (but reiterating the *Friedman* court's advisory).

■ Rather, as noted above, "we review the validity of a defendant's waiver of his/her right to a jury trial under the totality of the circumstances surrounding the case, taking into account the defendant's background, experience, and conduct. *See Reponte,* 57 Haw. at 361, 556 P.2d at 583." *Friedman,* 93 Hawai'i at 70, 996 P.2d at 275. Here, Barros gave his jury waiver after the court twice referred him to the public defender for the partial but express purpose of deciding whether to waive or assert his right to a jury trial. In his colloquy with the district court, Barros remained *pro se,* but his reiterated refusal of a jury trial was nonetheless direct and unequivocal. Further, Barros confirmed he was informed of the nature of a jury trial via an earlier exposition by the district court, to which he had apparently attended, and consequently knew what it was. Finally, his express waiver of a jury trial was once again clear, direct and unequivocal, consistent with his mien throughout the entire colloquy. Even after finding that Barros had waived his right to a jury trial, the district court recommended to Barros, "I think you should talk it over with a public defender." When Barros appeared for trial with counsel, the district court again addressed the waiver issue and asked the DPD to "double check it." The DPD confirmed the waiver, whereupon the district court proceeded to trial.

Our consideration of the totality of the circumstances in this case inclines us to a conclusion of waiver. More to the point, it was Barros who had the burden of "demonstrating by a preponderance of the evidence that [his] waiver was involuntary." *Friedman,* 93 Hawai'i at 69, 996 P.2d at 274 (cita-

tion omitted). He proposes to do so simply by elaborating at length upon the several omissions in the district court's colloquy revealed in comparison with the *Duarte-Higareda* model, and baldly asserting that each reflects an actual gap in his comprehension of his jury trial right:

> The record demonstrates that the trial court wholly ignored the instruction of Hawai'i's Appellate courts to engage in the four part colloquy to aid in ensuring voluntary waivers of the right to jury trial. Although the trial court informed Mr. Barros that he had a right to a jury trial, the court failed to instruct him as to any of the key components of that right discussed in *Friedman* and *Valdez.* Consequently, Mr. Barros was unaware that a jury is comprised of twelve members of the community, that he could take part in jury selection, that the jury verdict must be unanimous, and that the court alone would decide his guilt or innocence if he waived his right to a jury trial.

Reply Brief at 3. Under *Friedman,* this is plainly insufficient. Barros "has not pointed to any facts contained in the record demonstrating that his oral waiver at his arraignment was not voluntary and knowing." *Friedman,* 93 Hawai'i at 70, 996 P.2d at 275. He has not, for example, pointed to any facts in the record—other than the deficiencies he perceives in the district court's colloquy—which might indicate that his reiterated refusal of a jury trial was incompetent or coerced, or that he was mistaken or misled in his professed understanding of what a jury trial is, or that his jury waiver was otherwise not intelligently and voluntarily undertaken.

In the same vein, but closer to the true heart of *Friedman,* Barros has "failed to direct us to any 'salient fact' bearing upon his ability to understand his jury waiver[,]" *id.* (citation omitted), such as the defendant's lack of English in *Duarte-Higareda,* [113 F.3d 1000 (1997)], *id.* at 69, 996 P.2d at 274, "*that would have created the need for an extensive colloquy by the trial court,* and, thus, his argument is without merit." *Id.* at 70, 996 P.2d at 275 (citation omitted; emphasis supplied). Such "salient facts" in the first instance, drive the inquiry on appeal as to

whether a jury waiver colloquy was sufficient. It is not the other way around. *Id.* In the absence of such and under the totality of the circumstances of this case, the district court's colloquy was sufficient to obtain a valid jury waiver, and Barros' first point of error must fail.

## B. Judgment of Criminal Contempt of Court.

With respect to the judgment of conviction for criminal contempt of court, Barros contends, the State concedes and we confirm, *State v. Hoang,* 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) ("a confession of error by the prosecution is not binding upon an appellate court" (citation and internal quotation marks omitted)), that the district court erroneously failed to comply with the statutory command to fully set forth "the particular circumstances of the offense ... in the judgment and in the order or warrant of commitment." HRS § 710–1077(5) (1993). *See also State v. Lloyd,* 88 Hawai'i 188, 189, 964 P.2d 642, 643 (1998). We therefore vacate the judgment of criminal contempt of court and remand for entry of "a judgment stating the particular circumstances of the offense committed by [Barros,]" *id.* at 191, 964 P.2d at 645, and for re-sentencing as a petty misdemeanor offense. *See supra,* footnote 5.

## C. Sufficiency of the Evidence of Violation of the TRO.

Barros next contends there was insufficient evidence to convict him of violation of the TRO.

"On appeal, the test to determine the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to reach a conclusion." *Id.* at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted).

"An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge." *State v. Eastman,* 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996) (citations omitted).

It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part. As the trier of fact, the judge may draw all reasonable and legitimate inferences and deductions from the evidence, and the findings of the trial court will not be disturbed unless clearly erroneous.

*Id.* (citations omitted).

"It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction." *Ildefonso,* 72 Haw. at 576–77, 827 P.2d at 651 (citation and internal quotation marks omitted).

Barros begins his argument with a brief rumination upon the district court's defective assessment of the weight of certain evidence and the inferences to be drawn therefrom. We reject it, as such. *Eastman,* 81 Hawai'i at 139, 913 P.2d at 65. Barros' primary argument on this point is, that the district court admitted inadmissible hearsay, without which there would have been insufficient evidence to convict him of violation of the TRO. The evidence in question is Soares' testimony that Wyman told her his brother Barros had sent him to get the keys back.

First, we disagree there was insufficient other evidence to convict Barros of violation of the TRO. In the course of its ruling, the district court told Barros, "I believe most of what Ms. Soares told me." It was the prerogative of the district court to "accept or reject any witness's testimony in whole or in part." *Id.* at 139, 913 P.2d at 65. Barros himself testified that, when he got home from work that afternoon, he discovered money missing from his room and immediately suspected Soares because of the lack of forced entry and her prior possession of the keys.

Barros stipulated that the police served him with the TRO soon after. That he thus knew of the TRO's restrictions upon him, and sought to get around them by sending Wyman instead to Soares' apartment that evening to confront her about the TRO and take back the keys, were "reasonable and legitimate inferences and deductions from the evidence" which the district court was entitled to make, *id.* (citation omitted), and constituted "substantial evidence to support the conclusion of the trier of fact." *Ildefonso,* 72 Haw. at 576, 827 P.2d at 651 (citations omitted). Wyman's reaction to the imminent approach of the police further buttresses the district court's implicit conclusion that Wyman knew he was not there legitimately on his own behalf.

■■■ Having said all that, and noting that the district court never expressly and definitively decided the hearsay objection it had "overruled at this point[,]" and assuming, *arguendo,* that the subject testimony was indeed inadmissible hearsay,[6] we conclude the error was harmless beyond a reasonable doubt. "It is well established that a judge is presumed not to be influenced by incompetent evidence[,]" *State v. Antone,* 62 Haw. 346, 353, 615 P.2d 101, 107 (1980) (citations omitted), and "the normal rule is that if there is sufficient competent evidence to support the judgment or finding below, there is a presumption that any incompetent evidence was disregarded and the issue determined from a consideration of competent evidence only." *State v. Gutierrez,* 1 Haw.App. 268, 270, 618 P.2d 315, 317 (1980) (citations omitted). *See also State v. Vliet,* 91 Hawai'i 288, 298, 983 P.2d 189, 199 (1999). Nothing in our independent review of the record appears to rebut this presumption. Accordingly, this point of error lacks merit:

> Given the absence of a jury in the case at bar, and in light of the substantial evidence contained in the record ..., we are convinced that there is no "reasonable possibility that error might have contributed to conviction." *See State v. Kaiama,* 81 Ha-

wai'i 15, 22–23, 911 P.2d 735, 742–43 (1996) ("Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction." (Brackets and citation omitted)); HRPP Rule 52(a).

*Vliet,* 91 Hawai'i at 298, 983 P.2d at 199.

### D.  Sufficiency of the Evidence of Criminal Contempt of Court.

■■■ For his last point of error, Barros maintains there was insufficient evidence to convict him of criminal contempt of court. His argument amounts to nothing more than animadversions upon the district court's "decisions with respect to the credibility of witnesses and the weight of the evidence," and its "inferences and deductions from the evidence," all of which are well "within the trial court's prerogative[.]" *Eastman,* 81 Hawai'i at 139, 913 P.2d at 65 (citations omitted). By the same token, Soares' testimony that Barros telephoned her on July 6, 2001 was "substantial evidence to support the conclusion of the trier of fact." *Ildefonso,* 72 Haw. at 576, 827 P.2d at 651 (citations omitted).

### III.  Conclusion.

Based upon the foregoing, we vacate the March 8, 2002 judgment of criminal contempt of court and remand for entry of a judgment of conviction stating the particular circumstances of the offense committed by Barros, and for re-sentencing as a petty misdemeanor offense. The March 8, 2002 judgment of conviction and sentence for violation of the TRO is affirmed.

---

6.  *But see* Hawai'i Rules of Evidence (HRE) Rule 803(a)(1)(A) (1993) (admission by party-opponent), as to the underlying layer of hearsay, and HRE Rule 803(a)(2)(A) (1993) (vicarious admissions), as to the overlay of hearsay. *See general-*

*ly,* HRE Rule 805 (1993) ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").